# UNITED STATES *v.* PRICE ET AL.

Nos. 59 and 60.   Argued November 9, 1965.—
Decided March 28, 1966.

*Solicitor General Marshall* argued the cause for the United States. With him on the brief were *Assistant Attorney General Doar, Louis F. Claiborne* and *Gerald P. Choppin.*

*H. C. Mike Watkins* argued the cause for appellees. With him on the brief were *Dennis Goldman, Laurel G. Weir* and *Herman Alford.*

MR. JUSTICE FORTAS delivered the opinion of the Court.

These are direct appeals from the dismissal in part of two indictments returned by the United States Grand Jury for the Southern District of Mississippi. The indictments allege assaults by the accused persons upon the rights of the asserted victims to due process of law under the Fourteenth Amendment. The indictment in No. 59 charges 18 persons [1] with violations of 18 U. S. C. § 241 (1964 ed.). In No. 60, the same 18 persons are charged with offenses based upon 18 U. S. C. § 242 (1964 ed.). These are among the so-called civil rights statutes which have come to us from Reconstruction days, the period in our history which also produced the Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution.

The sole question presented in these appeals is whether the specified statutes make criminal the conduct for which the individuals were indicted. It is an issue of construction, not of constitutional power. We have no doubt of "the power of Congress to enforce by appropriate criminal sanction every right guaranteed by the Due Process Clause of the Fourteenth Amendment." *United States* v. *Williams,* 341 U. S. 70, 72. [2]

---

[1] One of the defendants charged in the two indictments, James E. Jordan, is not a party to the present appeal. His case was transferred under Rule 20, Fed. Rules Crim. Proc., to the United States District Court for the Middle District of Georgia.

[2] Cf. Mr. Justice Holmes in *United States* v. *Mosley,* 238 U. S. 383, 386 (a federal voting rights case under an earlier version of § 241): "It is not open to question that this statute is constitutional . . . ." The source of congressional power in this case is, of

The events upon which the charges are based, as alleged in the indictments, are as follows: On June 21, 1964, Cecil Ray Price, the Deputy Sheriff of Neshoba County, Mississippi, detained Michael Henry Schwerner, James Earl Chaney and Andrew Goodman in the Neshoba County jail located in Philadelphia, Mississippi. He released them in the dark of that night. He then proceeded by automobile on Highway 19 to intercept his erstwhile wards. He removed the three men from their automobile, placed them in an official automobile of the Neshoba County Sheriff's office, and transported them to a place on an unpaved road.

These acts, it is alleged, were part of a plan and conspiracy whereby the three men were intercepted by the 18 defendants, including Deputy Sheriff Price, Sheriff Rainey and Patrolman Willis of the Philadelphia, Mississippi, Police Department. The purpose and intent of the release from custody and the interception, according to the charge, were to "punish" the three men. The defendants, it is alleged, "did wilfully assault, shoot and kill" each of the three. And, the charge continues, the bodies of the three victims were transported by one of the defendants from the rendezvous on the unpaved road to the vicinity of the construction site of an earthen dam approximately five miles southwest of Philadelphia, Mississippi.

---

course, § 5 of the Fourteenth Amendment, which reads: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

There are three "Williams" cases arising from the same events. The first, with no bearing on the present appeal is United States v. Williams, 341 U. S. 58, involving a prosecution for perjury. The second, United States v. Williams, 341 U. S. 70, was a prosecution for violation of § 241; it will be referred to hereinafter as Williams I. The third, Williams v. United States, 341 U. S. 97, was a prosecution for violation of § 242; it will be referred to as Williams II.

These are federal and not state indictments. They do not charge as crimes the alleged assaults or murders. The indictments are framed to fit the stated federal statutes, and the question before us is whether the attempt of the draftsman for the Grand Jury in Mississippi has been successful: whether the indictments charge offenses against the various defendants which may be prosecuted under the designated federal statutes.

We shall deal first with the indictment in No. 60, based on § 242 of the Criminal Code, and then with the indictment in No. 59, under § 241. We do this for ease of exposition and because § 242 was enacted by the Congress about four years prior to § 241.[3] Section 242 was enacted in 1866; § 241 in 1870.

## I. No. 60.

Section 242 defines a misdemeanor, punishable by fine of not more than $1,000 or imprisonment for not more than one year, or both. So far as here significant, it provides punishment for "Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States . . . ."

The indictment in No. 60 contains four counts, each of which names as defendants the three officials and 15 nonofficial persons. The First Count charges, on the basis of allegations substantially as set forth above, that all of the defendants conspired "to wilfully subject" Schwerner, Chaney and Goodman "to the deprivation

---

[3] In the interest of clarity, we shall use the present designation of the statutes throughout this discussion. Reference is made to the Appendix to Mr. Justice Frankfurter's opinion in *Williams* I, 341 U. S., at 83, which contains a table showing major changes in the statutes through the years.

of their right, privilege and immunity secured and protected by the Fourteenth Amendment to the Constitution of the United States not to be summarily punished without due process of law by persons acting under color of the laws of the State of Mississippi." This is said to constitute a conspiracy to violate § 242, and therefore an offense under 18 U. S. C. § 371 (1964 ed.). The latter section, the general conspiracy statute, makes it a crime to conspire to commit any offense against the United States. The penalty for violation is the same as for direct violation of § 242—that is, it is a misdemeanor.[4]

On a motion to dismiss, the District Court sustained this First Count as to all defendants. As to the sheriff, deputy sheriff and patrolman, the court recognized that each was clearly alleged to have been acting "under color of law" as required by § 242.[5] As to the private persons, the District Court held that "[I]t is immaterial to the conspiracy that these private individuals were not acting under color of law" because the count charges that they were conspiring with persons who were so acting. See *United States* v. *Rabinowich,* 238 U. S. 78, 87.

The court necessarily was satisfied that the indictment, in alleging the arrest, detention, release, interception and killing of Schwerner, Chaney and Goodman, adequately stated as the purpose of the conspiracy, a violation of § 242, and that this section could be violated by "wilfully subject[ing the victims] . . . to the deprivation of their right, privilege and immunity" under the Due Process Clause of the Fourteenth Amendment.

---

[4] "If . . . the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor." 18 U. S. C. § 371 (1964 ed.).

[5] This is settled by our decisions in *Screws* v. *United States,* 325 U. S. 91, 107–113, and *Williams* II, 341 U. S., at 99–100.

No appeal was taken by the defendants from the decision of the trial court with respect to the First Count and it is not before us for adjudication.

The Second, Third and Fourth Counts of the indictment in No. 60 charge all of the defendants, not with conspiracy, but with substantive violations of § 242. Each of these counts charges that the defendants, acting "under color of the laws of the State of Mississippi," "did wilfully assault, shoot and kill" Schwerner, Chaney and Goodman, respectively, "for the purpose and with the intent" of punishing each of the three and that the defendants "did thereby wilfully deprive" each "of rights, privileges and immunities secured and protected by the Constitution and the laws of the United States"—namely, due process of law.

The District Court held these counts of the indictment valid as to the sheriff, deputy sheriff and patrolman. But it dismissed them as against the nonofficial defendants because the counts do not charge that the latter were "officers in fact, or de facto in anything allegedly done by them 'under color of law.'"

We note that by sustaining these counts against the three officers, the court again necessarily concluded that an offense under § 242 is properly stated by allegations of willful deprivation, under color of law, of life and liberty without due process of law. We agree. No other result would be permissible under the decisions of this Court. *Screws* v. *United States,* 325 U. S. 91; *Williams* II.[6]

---

[6] ". . . where police take matters in their own hands, seize victims, beat and pound them until they confess, there cannot be the slightest doubt that the police have deprived the victim of a right under the Constitution. It is the right of the accused to be tried by a legally constituted court, not by a kangaroo court." *Williams* II, 341 U. S., at 101.

But we cannot agree that the Second, Third or Fourth Counts may be dismissed as against the nonofficial defendants. Section 242 applies only where a person indicted has acted "under color" of law. Private persons, jointly engaged with state officials in the prohibited action, are acting "under color" of law for purposes of the statute. To act "under color" of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents.[7]

---

[7] "Under color" of law means the same thing in § 242 that it does in the civil counterpart of § 242, 42 U. S. C. § 1983 (1964 ed.). *Monroe* v. *Pape,* 365 U. S. 167, 185 (majority opinion), 212 (Frankfurter, J., dissenting). In cases under § 1983, "under color" of law has consistently been treated as the same thing as the "state action" required under the Fourteenth Amendment. See, *e. g., Smith* v. *Allwright,* 321 U. S. 649; *Terry* v. *Adams,* 345 U. S. 461; *Simkins* v. *Moses H. Cone Memorial Hospital,* 323 F. 2d 959 (C. A. 4th Cir.), cert. denied, 376 U. S. 938; *Smith* v. *Holiday Inns,* 336 F. 2d 630 (C. A. 6th Cir.); *Hampton* v. *City of Jacksonville,* 304 F. 2d 320 (C. A. 5th Cir.), cert. denied, 371 U. S. 911; *Boman* v. *Birmingham Transit Co.,* 280 F. 2d 531 (C. A. 5th Cir.); *Kerr* v. *Enoch Pratt Free Library,* 149 F. 2d 212 (C. A. 4th Cir.), cert. denied, 326 U. S. 721.

The contrary view in a § 242 context was expressed by the dissenters in *Screws,* 325 U. S., at 147–149, and was rejected then, later in *Williams* II, and finally—in a § 1983 case—in *Monroe* v. *Pape, supra.* Cf. *Peterson* v. *City of Greenville,* 373 U. S. 244, 250 (separate opinion of HARLAN, J.). Recent decisions of this Court which have given form to the "state action" doctrine make it clear that the indictments in this case allege conduct on the part of the "private" defendants which constitutes "state action," and hence action "under color" of law within § 242. In *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715, we held that there is "state action" whenever the "State has so far insinuated ·itself into a position of interdependence [with the otherwise 'private' person whose conduct is said to violate the Fourteenth Amendment] . . . that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth

In the present case, according to the indictment, the brutal joint adventure was made possible by state detention and calculated release of the prisoners by an officer of the State. This action, clearly attributable to the State, was part of the monstrous design described by the indictment. State officers participated in every phase of the alleged venture: the release from jail, the interception, assault and murder. It was a joint activity, from start to finish. Those who took advantage of participation by state officers in accomplishment of the foul purpose alleged must suffer the consequences of that participation. In effect, if the allegations are true, they were participants in official lawlessness, acting in willful concert with state officers and hence under color of law.

Appellees urge that the decision of the District Court was based upon a construction of the indictment to the effect that it did not charge the private individuals with acting "under color" of law. Consequently, they urge us to affirm in No. 60. In any event, they submit, since the trial court's decision was based on the inadequacy of the indictment and not on construction of the statute, we have no jurisdiction to review it on direct appeal. *United States* v. *Swift & Co.,* 318 U. S. 442. We do not agree. Each count of the indictment specifically alleges that all of the defendants were acting "under color of the laws of the State of Mississippi." The fault lies not in the indictment, but in the District Court's view that the statute requires that each offender be an official or that

---

Amendment." 365 U. S., at 725. Cf. *Pennsylvania* v. *Board of Trusts,* 353 U. S. 230; *Evans* v. *Newton,* 382 U. S. 296; *Peterson* v. *City of Greenville,* 373 U. S. 244; *Lombard* v. *Louisiana,* 373 U. S. 267; *Robinson* v. *Florida,* 378 U. S. 153; *Griffin* v. *Maryland,* 378 U. S. 130; *American Communications Assn.* v. *Douds,* 339 U. S. 382, 401; *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451; *Smith* v. *Allwright,* 321 U. S. 649; *Terry* v. *Adams,* 345 U. S. 461; *Williams II,* 341 U. S., at 99–100.

he act in an official capacity. We have jurisdiction to consider this statutory question on direct appeal and, as we have shown, the trial court's determination of it is in error. Since each of the private individuals is indictable as a principal acting under color of law, we need not consider whether he might be held to answer as an "aider or abettor" under 18 U. S. C. § 2 (1964 ed.), despite omission to include such a charge in the indictment.

Accordingly, we reverse the dismissal of the Second, Third and Fourth Counts of the indictment in No. 60 and remand for trial.

## II. No. 59.

No. 59 charges each of the 18 defendants with a felony—a violation of § 241. This indictment is in one count. It charges that the defendants "conspired together . . . to injure, oppress, threaten and intimidate" Schwerner, Chaney and Goodman "in the free exercise and enjoyment of the right and privilege secured to them by the Fourteenth Amendment to the Constitution of the United States not to be deprived of life or liberty without due process of law by persons acting under color of the laws of Mississippi." The indictment alleges that it was the purpose of the conspiracy that Deputy Sheriff Price would release Schwerner, Chaney and Goodman from custody in the Neshoba County jail at such time that Price and the other 17 defendants "could and would intercept" them "and threaten, assault, shoot and kill them." The penalty under § 241 is a fine of not more than $5,000, or imprisonment for not more than 10 years, or both.

Section 241 is a conspiracy statute. It reads as follows:

"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the

United States, or because of his having so exercised the same; or

"If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

"They shall be fined not more than $5,000 or imprisoned not more than ten years, or both."

The District Court dismissed the indictment as to all defendants. In effect, although § 241 includes rights or privileges secured by the Constitution or laws of the United States without qualification or limitation, the court held that it does not include rights protected by the Fourteenth Amendment.

It will be recalled that in No. 60 the District Court held that § 242 included the denial of Fourteenth Amendment rights—the same right to due process involved in the indictment under § 241. Both include rights or privileges secured by the Constitution or laws of the United States. Neither is qualified or limited. Each includes, presumably, *all* of the Constitution and laws of the United States. To the reader of the two sections, versed only in the English language, it may seem bewildering that the two sections could be so differently read.

But the District Court purported to read the statutes with the gloss of *Williams* I. In that case, the only case in which this Court has squarely confronted the point at issue, the Court did in fact sustain dismissal of an indictment under § 241. But it did not, as the District Court incorrectly assumed, hold that § 241 is inapplicable to Fourteenth Amendment rights. The Court divided equally on the issue. Four Justices, in an opinion by Mr. Justice Frankfurter, were of the view that § 241 "only covers conduct which interferes with rights arising from the substantive powers of the Federal Government"—rights "which Congress can beyond doubt

constitutionally secure against interference by private individuals." 341 U. S., at 73, 77. Four other Justices, in an opinion by Mr. Justice Douglas, found no support for Mr. Justice Frankfurter's view in the language of the section, its legislative history, or its judicial interpretation up to that time. They read the statute as plainly covering conspiracies to injure others in the exercise of Fourteenth Amendment rights. They could see no obstacle to using it to punish deprivations of .such rights. Dismissal of the indictment was affirmed because Mr. Justice Black voted with those who joined Mr. Justice Frankfurter. He did so, however, for an entirely different reason—that the prosecution was barred by *res judicata*—and he expressed no view on the issue whether "§ 241, as applied, is too vague and uncertain in scope to be consistent with the Fifth Amendment." *Williams* I thus left the proper construction of § 241, as regards its applicability to protect Fourteenth Amendment rights, an open question.

In view of the detailed opinions in *Williams* I, it would be supererogation to track the arguments in all of their intricacy. On the basis of an extensive re-examination of the question, we conclude that the District Court erred; that § 241 must be read as it is written—to reach conspiracies "to injure . . . any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States . . ."; that this language includes rights or privileges protected by the Fourteenth Amendment; that whatever the ultimate coverage of the section may be, it extends to conspiracies otherwise within the scope of the section, participated in by officials alone or in collaboration with private persons; and that the indictment in No. 59 properly charges such a conspiracy in violation of § 241. We shall confine ourselves to a review of the major considerations which induce our conclusion.

1. There is no doubt that the indictment in No. 59 sets forth a conspiracy within the ambit of the Fourteenth Amendment. Like the indictment in No. 60, *supra*, it alleges that the defendants acted "under color of law" and that the conspiracy included action by the State through its law enforcement officers to punish the alleged victims without due process of law in violation of the Fourteenth Amendment's direct admonition to the States.

The indictment specifically alleges that the sheriff, deputy sheriff and a patrolman participated in the conspiracy; that it was a part of the "plan and purpose of the conspiracy" that Deputy Sheriff Price, "while having [the three victims] . . . in his custody in the Neshoba County Jail . . . would release them from custody at such time that he [and others of the defendants] . . . could and would intercept [the three victims] . . . and threaten, assault, shoot and kill them."

This is an allegation of state action which, beyond dispute, brings the conspiracy within the ambit of the Fourteenth Amendment. It is an allegation of official, state participation in murder, accomplished by and through its officers with the participation of others. It is an allegation that the State, without the semblance of due process of law as required of it by the Fourteenth Amendment, used its sovereign power and office to release the victims from jail so that they were not charged and tried as required by law, but instead could be intercepted and killed. If the Fourteenth Amendment forbids denial of counsel, it clearly denounces denial of any trial at all.

As we have consistently held "The Fourteenth Amendment protects the individual against *state action,* not against wrongs done by *individuals." Williams* I, 341 U. S., at 92 (opinion of DOUGLAS, J.). In the present case, the participation by law enforcement officers, as

alleged in the indictment, is clearly state action, as we have discussed, and it is therefore within the scope of the Fourteenth Amendment.

2. The argument, however, of Mr. Justice Frankfurter's opinion in *Williams* I, upon which the District Court rests its decision, cuts beneath this. It does not deny that the accused conduct is within the scope of the Fourteenth Amendment, but it contends that in enacting § 241, the Congress intended to include only the rights and privileges conferred on the citizen by reason of the "substantive" powers of the Federal Government—that is, by reason of federal power operating directly upon the citizen and not merely by means of prohibitions of state action. As the Court of Appeals for the Fifth Circuit in *Williams* I, relied upon in the opinion below, put it, "the Congress had in mind the federal rights and privileges which appertain to citizens as such and not the general rights extended to all persons by the . . . Fourteenth Amendment." 179 F. 2d 644, 648. We do not agree.

The language of § 241 is plain and unlimited. As we have discussed, its language embraces *all* of the rights and privileges secured to citizens by *all* of the Constitution and *all* of the laws of the United States. There is no indication in the language that the sweep of the section is confined to rights that are conferred by or "flow from" the Federal Government, as distinguished from those secured or confirmed or guaranteed by the Constitution. We agree with the observation of Mr. Justice Holmes in *United States* v. *Mosley,* 238 U. S. 383, 387–388, that

> "The source of this section in the doings of the Ku Klux and the like is obvious and acts of violence obviously were in the mind of Congress. Naturally Congress put forth all its powers. . . . [T]his sec-

tion dealt with Federal rights and with all Federal rights, and protected them in the lump . . . . [It should not be construed so] as to deprive citizens of the United States of the general protection which on its face § 19 [now § 241] most reasonably affords." [8]

We believe, with Mr. Justice Holmes, that the history of the events from which § 241 emerged illuminates the purpose and means of the statute with an unmistakable light. We think that history leaves no doubt that, if we are to give § 241 the scope that its origins dictate, we must accord it a sweep as broad as its language. We are not at liberty to seek ingenious analytical instruments for excluding from its general language the Due Process Clause of the Fourteenth Amendment—particularly since the violent denial of legal process was one of the reasons motivating enactment of the section.[9]

Section 241 was enacted as part of what came to be known as the Enforcement Act of 1870, 16 Stat. 140.[10] The Act was passed on May 31, 1870, only a few months

---

[8] See also Mr. Justice Rutledge, concurring in result, in *Screws* v. *United States*, 325 U. S. 91, 120.

[9] It would be strange, indeed, were this Court to revert to a construction of the Fourteenth Amendment which would once again narrow its historical purpose—which remains vital and pertinent to today's problems. As is well known, for many years after Reconstruction, the Fourteenth Amendment was almost a dead letter as far as the civil rights of Negroes were concerned. Its sole office was to impede state regulation of railroads or other corporations. Despite subsequent statements to the contrary, nothing in the records of the congressional debates or the Joint Committee on Reconstruction indicates any uncertainty that its objective was the protection of civil rights. See Stampp, The Era of Reconstruction, 1865–1877, 136–137 (1965).

[10] The official title is "An Act to enforce the Right of Citizens of the United States to vote in the several States of this Union, and for other Purposes."

after ratification of the Fifteenth Amendment. In addition to the new § 241, it included a re-enactment of a provision of the Civil Rights Act of 1866 which is now § 242. The intended breadth of § 241 is emphasized by contrast with the narrowness of § 242 as it then was.[11] Section 242 forbade the deprivation, "under color of any law," of "any right secured or protected by this act." The rights protected by the Act were narrow and specific: "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens [and to] be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and none other." Act of May 31, 1870, § 16, 16 Stat. 144, re-enacting with minor changes Act of April 9, 1866, § 1, 14 Stat. 27. Between 1866 and 1870 there was much agitated criticism in the Congress and in the Nation because of the continued denial of rights to Negroes, sometimes accompanied by violent assaults. In response to the demands for more stringent legislation Congress enacted the Enforcement Act of 1870. Congress had before it and re-enacted § 242 which was explicitly limited as we have described. At the same time, it included § 241 in the Act using broad language to cover not just the rights enumerated in § 242, but all rights and privileges under the Constitution and laws of the United States.

---

[11] The substantial difference in coverage of the two sections as they were in the Act of 1870 precludes the argument that § 241 should be narrowly construed to exclude Fourteenth Amendment rights because otherwise it would have been duplicative of § 242 taken in conjunction with the general conspiracy statute, 18 U. S. C. § 371. If, as we hold, § 241 was intended to cover all Fourteenth Amendment rights, it was far broader in 1870 than was § 242. For other reasons for rejecting the duplication argument, see the opinion of MR. JUSTICE DOUGLAS in *Williams* I, 341 U. S., at 88, n. 2.

It was not until the statutory revision of 1874 that the specific enumeration of protected rights was eliminated from § 242. The section was then broadened to include as wide a range of rights as § 241 already did: "any rights, privileges, or immunities, secured or protected by the Constitution and laws of the United States." The substantial change thus effected was made with the customary stout assertions of the codifiers that they had merely clarified and reorganized without changing substance.[12] Section 241 was left essentially unchanged, and neither in the 1874 revision nor in any subsequent re-enactment has there been the slightest indication of a congressional intent to narrow or limit the original broad scope of § 241. It is clear, therefore, that § 241, from original enactment through subsequent codifications, was intended to deal, as Mr. Justice Holmes put it, with conspiracies to interfere with "Federal rights and with all Federal rights." We find no basis whatsoever for a judgment of Solomon which would give to the statute less than its words command.[13]

The purpose and scope of the 1866 and 1870 enactments must be viewed against the events and passions of the time.[14] The Civil War had ended in April 1865. Relations between Negroes and whites were increasingly turbulent.[15] Congress had taken control of the entire

[12] See 14 Stat. 74; 17 Stat. 579; S. Misc. Doc. No. 101, 40th Cong., 2d Sess.; H. Misc. Doc. No. 31, 40th Cong., 3d Sess.; S. Misc. Doc. No. 3, 42d Cong., 2d Sess.; 2 Cong. Rec. 646, 648, 1029, 1210, 1461.

[13] The opinion of MR. JUSTICE DOUGLAS in *Williams* I, 341 U. S., at 88, disposes of the argument that the words of § 241 themselves suggest the narrow meaning which the opinion of Mr. Justice Frankfurter found in the section.

[14] See generally, Stampp, The Era of Reconstruction, 1865–1877 (1965); Nevins, The Emergence of Modern America, 1865–1878 (1927).

[15] See H. R. Rep. No. 16, 39th Cong., 2d Sess., p. 12 *et seq.*

governmental process in former Confederate States. It had declared the governments in 10 "unreconstructed" States to be illegal and had set up federal military administrations in their place. Congress refused to seat representatives from these States until they had adopted constitutions guaranteeing Negro suffrage, and had ratified the Fourteenth Amendment. Constitutional conventions were called in 1868. Six of the 10 States fulfilled Congress' requirements in 1868, the other four by 1870.

For a few years "radical" Republicans dominated the governments of the Southern States and Negroes played a substantial political role. But countermeasures were swift and violent. The Ku Klux Klan was organized by southern whites in 1866 and a similar organization appeared with the romantic title of the Knights of the White Camellia. In 1868 a wave of murders and assaults was launched including assassinations designed to keep Negroes from the polls.[16] The States themselves were helpless, despite the resort by some of them to extreme measures such as making it legal to hunt down and shoot any disguised man.[17]

Within the Congress pressures mounted in the period between the end of the war and 1870 for drastic measures. A few months after the ratification of the Thirteenth Amendment on December 6, 1865, Congress, on April 9, 1866, enacted the Civil Rights Act of 1866, which, as we have described, included § 242 in its originally narrow form. On June 13, 1866, the Fourteenth Amendment was proposed, and it was ratified in July 1868. In February 1869 the Fifteenth Amendment was proposed,

---

[16] Cf. Nevins, *op. cit. supra,* at 351.

[17] See, *id.,* at 352; Morison, Oxford History of the American People 722–723 (1965).

and it was ratified in February 1870. On May 31, 1870, the Enforcement Act of 1870 was enacted.

In this context, it is hardly conceivable that Congress intended § 241 to apply only to a narrow and relatively unimportant category of rights.[18] We cannot doubt that the purpose and effect of § 241 was to reach assaults upon rights under the entire Constitution, including the Thirteenth, Fourteenth and Fifteenth Amendments, and not merely under part of it.

This is fully attested by the only statement explanatory of § 241 in the recorded congressional proceedings relative to its enactment. We refer to the speech of Senator Pool of North Carolina who introduced the provisions as an amendment to the Enforcement Act of 1870. The Senator's remarks are printed in full in the Appendix to this opinion.[19] He urged that the section was needed in order to punish invasions of the newly adopted Fourteenth and Fifteenth Amendments to the Constitution. He acknowledged that the States as such were beyond the reach of the punitive process, and that the legislation must therefore operate upon individuals. He made it clear that "It matters not whether those individuals be officers or whether they are acting upon their own responsibility." We find no evidence whatever that Senator Pool intended that § 241 should not cover violations

---

[18] See, for example, *United States* v. *Waddell,* 112 U. S. 76 (right to perfect a homestead claim); *United States* v. *Classic,* 313 U. S. 299 (right to vote in federal elections); *Logan* v. *United States,* 144 U. S. 263 (right to be secure from unauthorized violence while in federal custody); *In re Quarles,* 158 U. S. 532 (right to inform of violations of federal law). Cf. also *United States* v. *Cruikshank,* 92 U. S. 542, 552; *Hague* v. *CIO,* 307 U. S. 496, 512–513 (opinion of Roberts, J.); *Collins* v. *Hardyman,* 341 U. S. 651, 660.

[19] We include these remarks only to show that the Senator clearly intended § 241 to cover Fourteenth Amendment rights.

of Fourteenth Amendment rights, or that it should not include state action or actions by state officials.

We conclude, therefore, that it is incumbent upon us to read § 241 with full credit to its language. Nothing in the prior decisions of this Court or of other courts which have considered the matter stands in the way of that conclusion.[20]

The present application of the statutes at issue does not raise fundamental questions of federal-state relationships. We are here concerned with allegations which squarely and indisputably involve state action in direct violation of the mandate of the Fourteenth Amendment—that no State shall deprive any person of life or liberty without due process of law. This is a direct, traditional concern of the Federal Government. It is an area in which the federal interest has existed for at least a century, and in which federal participation has intensified as part of a renewed emphasis upon civil rights. Even as recently as 1951, when *Williams* I was decided, the federal role in the establishment and vindication of fundamental rights—such as the freedom to travel, nondiscriminatory access to public areas and nondiscriminatory educational facilities—was neither as pervasive nor as intense as it is today. Today, a decision interpreting a federal law in accordance with its historical design, to punish denials by state action of constitutional rights of the person can hardly be regarded as adversely affecting "the wise adjustment between State responsibility and national control . . . ." *Williams* I,

---

[20] This Court has rejected the argument that the constitutionality of § 241 may be affected by undue vagueness of coverage. The Court held with reference to § 242 that any deficiency is cured by the requirement that specific intent be proved. *Screws* v. *United States*, 325 U. S. 91. There is no basis for distinction between the two statutes in this respect. See *Williams* I, 341 U. S., at 93–95 (DOUGLAS, J.).

341 U. S., at 73 (opinion of Frankfurter, J.). In any event, the problem, being statutory and not constitutional, is ultimately, as it was in the beginning, susceptible of congressional disposition.

*Reversed and remanded.*

MR. JUSTICE BLACK concurs in the judgment and opinion of the Court except insofar as the opinion relies upon *United States* v. *Williams,* 341 U. S. 58; *United States* v. *Williams,* 341 U. S. 70; and *Williams* v. *United States,* 341 U. S. 97.

## APPENDIX TO OPINION OF THE COURT.

Remarks of Senator Pool of North Carolina on sponsoring Sections 5, 6 and 7 of the Enforcement Act of 1870 (Cong. Globe, 41st Cong., 2d Sess., pp. 3611–3613):

Mr. POOL. Mr. President, the question involved in the proposition now before the Senate is one in which my section of the Union is particularly interested; although since the ratification of the fifteenth amendment, which we are now about to enforce by appropriate legislation, other sections of the country have become more or less interested in the same question. It is entering upon a new phase of reconstruction; that is, to enforce by appropriate legislation those great principles upon which the reconstruction policy of Congress was based.

I said upon a former occasion on this floor that the reconstruction policy of Congress had been progressive, and that it was necessary that it should be progressive still. The mere act of establishing governments in the recently insurgent States was one thing; the great principles upon which Congress proposed to proceed in establishing those governments was quite another thing, involving principles which lie at the very foundation of all that has been done, and which are intimately con-

nected with all the results that must follow from that and from the legislation of Congress connected with the whole subject.

Mr. President, the first thing that was done was the passage of the thirteenth amendment, by which slavery in the United States was abolished. By that four millions of people were taken out from under the protecting hand of interested masters and turned loose to take care of themselves. They were turned loose and put upon their own resources in communities which were imbued with prejudices against them as a race, communities which for the most part had for years past—indeed from the very time when those who are now in existence were born—been taught and had instilled into them a prejudice against the equality which has been attempted to be established for the colored citizens of the United States.

Mr. President, the condition which that thirteenth amendment imposed on the late insurrectionary States was one which demanded the serious consideration and attention of this Government. The equality which by the thirteenth, fourteenth, and fifteenth amendments has been attempted to be secured for the colored men, has not only subjected them to the operation of the prejudices which had theretofore existed, but it has raised against them still stronger prejudices and stronger feelings in order to fight down the equality by which it is claimed they are to control the legislation of that section of the country. They were turned loose among those people, weak, ignorant, and poor. Those among the white citizens there who have sought to maintain the rights which you have thrown upon that class of people, have to endure every species of proscription, of opposition, and of vituperation in order to carry out the policy of Congress, in order to lift up and to uphold the rights which you have conferred upon that class. It is

for that reason not only necessary for the freedmen, but it is necessary for the white people of that section that there should be stringent and effective legislation on the part of Congress in regard to these measures of reconstruction.

We have heard on former occasions on the floor of the Senate that there were organizations which committed outrages, which went through communities for the purposes, of intimidating and coercing classes of citizens in the exercise of their rights. We have been told here that perhaps it might be well that retaliation should be resorted to on the part of those who are oppressed. Sir, the time will come when retaliation will be resorted to unless the Government of the United States interposes to command and to maintain the peace; when there will be retaliation and civil war; when there will be bloodshed and tumult in various communities and sections. It is not only necessary for the freedmen, but it is important to the white people of the southern section, that by plain and stringent laws the United States should interpose and preserve the peace and quiet of the community.

The fifteenth amendment to the Constitution of the United States provides that the right of citizens of the United States to vote shall not be denied or abridged by the United States, or by any State on account of race, color, or previous condition of servitude. It speaks of "the right of citizens to vote." It has been said that voting is a privilege; but this amendment recognizes it as a right in the citizen; and this right is not to "be denied or abridged by the United States, or by any State." What are we to understand by that? Can individuals abridge it with impunity? Is there no power in this Government to prevent individuals or associations of individuals from abridging or contravening that provision of the Constitution? If that be so, legislation is unnecessary. If our legislation is to apply only to the

States, it is perfectly clear that it is totally unnecessary, inasmuch as we cannot pass a criminal law as applicable to a State; nor can we indict a State officer as an officer. It must apply to individuals. A State might attempt to contravene that provision of the Constitution by passing some positive enactment by which it would be contravened, but the Supreme Court would hold such enactment to be unconstitutional, and in that way the State would be restrained. But the word "deny" is used. There are various ways in which a State may prevent the full operation of this constitutional amendment. It cannot—because the courts would prevent it—by positive legislation, but by acts of omission it may practically deny the right. The legislation of Congress must be to supply acts of omission on the part of the States. If a State shall not enforce its laws by which private individuals shall be prevented by force from contravening the rights of the citizen under the amendment, it is in my judgment the duty of the United States Government to supply that omission, and by its own laws and by its own courts to go into the States for the purpose of giving the amendment vitality there.

The word "deny" is used not only in this fifteenth amendment, but I perceive in the fourteenth amendment it is also used. When the fourteenth amendment was passed there was in existence what is known as the civil rights bill, a part of which has been copied in the Senate bill now pending. The civil rights bill recognized all persons born or naturalized in the United States as citizens, and provided that they should have certain rights which were enumerated. They are, "to make and enforce contracts, to sue, be made parties, give evidence, to inherit, purchase, lease, sell, hold and convey real and personal property," and to "the full and equal benefit of all laws and proceedings for the security of person and property."

The civil rights bill was to be enforced by making it criminal for any officer, under color of any State law, "to subject, or cause to be subjected, any citizen to the deprivation of any of the rights secured and protected" by the act. If an officer of any State were indicted for subjecting a citizen to the deprivation of any of those rights he was not to be indicted as an officer; it was as an individual. And so, under the fourteenth amendment to the Constitution, "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." There the word "deny" is used again; it is used in contradistinction to the first clause, which says, "No State shall make or enforce any law" which shall do so and so. That would be a positive act which would contravene the right of a citizen; but to say that it shall not deny to any person the equal protection of the law it seems to me opens up a different branch of the subject. It shall not deny by acts of omission, by a failure to prevent its own citizens from depriving by force any of their fellow-citizens of these rights. It is only when a State omits to carry into effect the provisions of the civil rights act, and to secure the citizens in their rights, that the provisions of the fifth section of the fourteenth amendment would be called into operation, which is, "that Congress shall enforce by appropriate legislation the provisions of this article."

There is no legislation that could reach a State to prevent its passing a law. It can only reach the individual citizens of the State in the enforcement of law. You have, therefore, in any appropriate legislation, to act on the citizen, not on the State. If you pass an act by which you make it an indictable offense for an officer

to execute any law of a State by which he trespasses upon any of these rights of the citizen it operates upon him as a citizen, and not as an officer. Why can you not just as well extend it to any other citizen of the country?

It is, in my judgment, incumbent upon Congress to pass the most stringent legislation on this subject. I believe that we have a perfect right under the Constitution of the United States, not only under these three amendments, but under the general scope and features and spirit of the Constitution itself, to go into any of these States for the purpose of protecting and securing liberty. I admit that when you go there for the purpose of restraining liberty, you can go only under delegated powers in express terms; but to go into the States for the purpose of securing and protecting the liberty of the citizen and the rights and immunities of American citizenship is in accordance with the spirit and whole object of the formation of the Union and the national Government.

There are, Mr. President, various ways in which the right secured by the fifteenth amendment may be abridged by citizens in a State. If a State should undertake by positive enactment, as I have said, to abridge the right of suffrage, the courts of the country would prevent it; and I find that in section two of the bill which has been proposed as a substitute by the Judiciary Committee of the Senate provision is made for cases where officers charged with registration or officers charged with the assessment of taxes and with making the proper entries in connection therewith, shall refuse the right to register or to pay taxes to a citizen. I believe the language of the Senate bill is sufficiently large and comprehensive to embrace any other class of officers that might be charged with any act that was necessary to enable a citizen to perform any prerequisite to voting. But, sir, individuals may prevent the exercise of the right of

suffrage; individuals may prevent the enjoyment of other rights which are conferred upon the citizen by the fourteenth amendment, as well as trespass upon the right conferred by the fifteenth. Not only citizens, but organizations of citizens, conspiracies, may be and are, as we are told, in some of the States formed for that purpose. I see in the fourth section of the Senate bill a provision for cases where citizens by threats, intimidation, bribery, or otherwise prevent, delay, or hinder the exercise of this right; but there is nothing here that strikes at organizations of individuals, at conspiracies for that purpose. I believe that any bill will be defective which does not make it a highly penal offense for men to conspire together, to organize themselves into bodies, for the express purpose of contravening the right conferred by the fifteenth amendment.

But, sir, there is a great, important omission in this bill as well as in that of the House. It seems not to have struck those who drew either of the two bills that the prevention of the exercise of the right of suffrage was not the only or the main trouble that we have upon our hands. Suppose there shall be an organization of individuals, or, if you please, a single individual, who shall take it upon himself to compel his fellow citizens to vote in a particular way. Suppose he threatens to discharge them from employment, to bring upon them the outrages which are being perpetrated by the Kuklux organizations, so as not to prevent their voting, but to compel them to vote in accordance with the dictates of the party who brings this coercion upon them. It seems to me it is necessary that we should legislate against that. That is a more threatening view of the subject than the mere preventing of registration or of entering men's names upon the assessment books for taxation or of depositing the ballot in the box. I think the bill cannot be perfected to meet the emergencies of the occasion

unless there be a section which meets that view of the case.

The Senator from Indiana [Mr. Morton] asks whether I have drawn an amendment to that effect. I have, but I cannot offer it at this time, for the simple reason that there is an amendment to an amendment pending.

Mr. MORTON. Let it be read for information.

Mr. POOL. It has been printed, and I send it to the desk to be read for information.

The Chief Clerk read the amendment intended to be proposed by Mr. Pool, as follows:

"Insert after section four of the Senate bill the following sections:

"SEC. 5. *And be it further enacted,* That it shall be unlawful for any person, with intent to hinder or influence the exercise of the right of suffrage as aforesaid, to coerce or intimidate, or attempt to coerce or intimidate any of the legally qualified voters in any State or Territory. Any person violating the provisions of this section shall be held guilty of a misdemeanor, and on conviction thereof shall be fined or imprisoned, or both, in the discretion of the court: the fine not to exceed $1,000, and the imprisonment not to exceed one year.

"SEC. 6. *And be it further enacted,* That if two or more persons shall band or conspire together, or go in disguise upon the public highway, or upon the premises of another, with intent to violate any provision of this act, or to injure, oppress, threaten, or intimidate any citizen with intent to prevent or hinder his free exercise and enjoyment of any right or privilege granted or secured to him by the Constitution or laws of the United States, such person shall be held guilty of felony, and on conviction thereof shall be fined and imprisoned; the fine not to exceed $5,000 and the imprisonment not to exceed ten years; and shall, moreover, be thereafter ineligible to and disabled from holding any office or place of honor,

profit, or trust created by the Constitution or laws of the United States.

"Sec. 7. *And be it further enacted,* That if in the act of violating any provision in either of the two preceding sections, any other felony, crime, or misdemeanor shall be committed, the offender may be indicted or prosecuted for the same in the courts of the United States, as hereinafter provided, for violations of this act, and on conviction thereof shall be punished for the same with such punishments as are attached to like felonies, crimes, and misdemeanors by the laws of the State in which the offense may be committed.

"Strike out section twelve and substitute therefor the following:

"*And be it further enacted,* That the President of the United States, or such person as he may empower for that purpose, may employ in any State such part of the land and naval forces of the United States, or of the militia, as he may deem necessary to enforce the complete execution of this act; and with such forces may pursue, arrest, and hold for trial all persons charged with the violation of any of the provisions of this act, and enforce the attendance of witnesses upon the examination or trial of such persons."

.        .        .        .        .

Mr. Pool. The Senator from Indiana asked if I had an amendment prepared which met the view of the case I was presenting in regard to the compelling of citizens to vote in a particular way. The first section of the amendment which I have offered uses this language:

"That it shall be unlawful for any person with intent to hinder or influence the exercise of the right of suffrage as aforesaid, to coerce or intimidate or attempt to coerce or intimidate any of the legally qualified voters in any State or Territory."

But, Mr. President, there is another view which seems to have been lost sight of entirely by those who have drawn both the House bill and the bill now pending before the Senate, and from which we apprehend very much danger. It is this: the oppression of citizens because of having voted in a particular way, or having voted at all. It may often happen, as it has happened up to this time already, that upon the close of an election colored persons will be discharged from employment by their employers. They may be subjected to outrages of various kinds because they have participated in an election, and cast their votes in a particular way. That is not done for the purpose of punishment so much as for the purpose of deterring them from voting in any succeeding election, or from voting in a way that those who perpetrate these outrages do not desire them to do. I find that branch of the subject is entirely left out of view in the bill.

There is another feature of my amendment which I deem of some importance. It is this:

"That if in the act of violating any provision in either of the two preceding sections any other felony, crime, or misdemeanor shall be committed, the offender may be indicted or prosecuted for the same in the courts of the United States."

I think the most effective mode of preventing this intimidation and these attempts at coercion, as well as the outrages which grow out of these attempts, would be found in making any offense committed in the effort to violate them indictable before the courts of the United States. As was said before, in the discussion of the Georgia question in the Senate, the juries in the communities where these outrages are committed are often composed of men who are engaged in them, or of their friends, or of those who connive at them, or of persons

who are intimidated by them, and in many instances they dare not bring in a true bill when there is an attempt to indict, or if a true bill be found, they dare not go for conviction on the final trial. It is for that reason that I believe it will be better, it will be the only effective remedy, to take such offenders before the courts of the United States, and there have them tried by a jury which is not imbued with the prejudices and interests of those who perpetrate the crimes.

These are the principal features of the amendment which I have drawn in the effort to perfect this bill; and there is another one to which I will call the attention of the Senate. It is that in regard to calling out the military forces of the United States. I find that in the civil rights bill, as in the bill which has been introduced by the Senate Judiciary Committee, the President is authorized, either by himself or by such person as he may empower for that purpose, to use the military forces of the United States to enforce the act. There in both instances it stops. It has been objected to here that the expression, "or such other person as he may empower for that purpose," should not be in the bill; that it may be subject to abuse. I think it would have no good effect to keep that language in. The President may send his officers and he may empower whomsoever he pleases to take charge of his forces without any such provision.

But there is a use for these forces which seems not to have been adverted to in either the civil rights bill or in the bill that is now pending before the Senate. It is the holding of these offenders for examination and trial after they are arrested. Their confederates, if they are put in the common prisons of the State, will in nine cases out of ten release them. But more important still is it to use these forces to compel the attendance of witnesses; for a subterfuge resorted to is to keep witnesses away

from the trial. In many instances witnesses are more or less implicated in the commission of the offense. In other cases the witnesses are intimidated and cannot be obtained upon the trial. So in the amendment which I have prepared I have proposed that these forces may be used to enforce the attendance of witnesses both upon the examination and the trial. My purpose in introducing this was to perfect the Senate bill. I think, as I said yesterday, that that bill is liable to less objection than the House bill. I think it is more efficacious in its provisions. I think it is better that the Senate should direct its attention to perfecting that bill, in order that it may be made, when perfected, a substitute for the bill that came from the House.

That much being said upon the purpose of perfecting the bill and making it efficacious, I have very little more to say. I did not intend when I rose to say much upon the general power, which has been questioned here, to pass any law at all. I think it is better to do nothing than to do that which will not have the proper effect. To do that which will not accomplish the purpose would be worse than doing nothing at all. That the United States Government has the right to go into the States and enforce the fourteenth and the fifteenth amendments is, in my judgment, perfectly clear, by appropriate legislation that shall bear upon individuals. I cannot see that it would be possible for appropriate legislation to be resorted to except as applicable to individuals who violate or attempt to violate these provisions. Certainly we cannot legislate here against States. As I said a few moments ago, it is upon individuals that we must press our legislation. It matters not whether those individuals be officers or whether they are acting upon their own responsibility; whether they are acting singly or in organizations. If there is to be appropriate legislation at all, it must be that which applies to individuals.

I believe that the United States has the right, and that it is an incumbent duty upon it, to go into the States to enforce the rights of the citizens against all who attempt to infringe upon those rights when they are recognized and secured by the Constitution of the country. If we do not possess that right the danger to the liberty of the citizen is great indeed in many parts of this Union. I think this question will come time and again as years pass by, perhaps before another year, in different forms before the Senate. It is well that we should deal with it now and deal with it squarely, and I hope that the Senate will not hesitate in doing so.

Mr. President, the liberty of a citizen of the United States, the prerogatives, the rights, and the immunities of American citizenship, should not be and cannot be safely left to the mere caprice of States either in the passage of laws or in the withholding of that protection which any emergency may require. If a State by omission neglects to give to every citizen within its borders a free, fair, and full exercise and enjoyment of his rights it is the duty of the United States Government to go into the State, and by its strong arm to see that he does have the full and free enjoyment of those rights.

Upon that ground the Republican party must stand in carrying into effect the reconstruction policy, or the whole fabric of reconstruction, with all the principles connected with it, amounts to nothing at all; and in the end it will topple and fall unless it can be enforced by the appropriate legislation, the power to enact which has been provided in each one of the great charters of liberty which that party has put forth in its amendments to the Constitution. Unless the right to enforce it by appropriate legislation is enforced stringently and to the point, it is clear to my mind that there will be no efficacy whatever in what has been done up to this time to carry out and to establish that policy.

I did not rise, sir, for the purpose of arguing the question very much in detail. I did not rise for the purpose of making any appeals to the Senate; but more for the purpose of asserting here and arguing for a moment the general doctrine of the right of the United States to intervene against individuals in the States who attempt to contravene the amendment to the Constitution which we are now endeavoring to enforce, and for the purpose of calling attention to the defects in the bill and offering a remedy for them.