[Crim. No. 6154. Third Dist. Dec. 17, 1971.]

THE PEOPLE, Plaintiff and Appellant, v.
AL PLESNIARSKI et al., Defendants and Respondents.

## Counsel

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Nelson P. Kempsky and Eddie T. Keller, Deputy Attorneys General, for Plaintiff and Appellant.

Allen P. Fields for Defendants and Respondents.

## OPINION

BRAY, J.*—The People appeal from a judgment of the Sacramento County Superior Court granting defendants' motion to dismiss the indictment.

### QUESTION PRESENTED

The court erred in granting the motion as defendants acted "under color of authority."

### RECORD

The Sacramento County Grand Jury indicted defendants in count one of the indictment with violation of section 149 of the Penal Code (assault by an officer under color of authority) and in count two with violation of section 245 of the Penal Code (assault with a deadly weapon). Defendants moved under section 995 for dismissal of the indictment. The district attorney stipulated that count two be stricken since it was mistakenly included in the indictment. The court, after a hearing, dismissed the indictment. The People appeal from the dismissal of count one.

### FACTS

Defendant Plesniarski had been an officer of the Sacramento Police Department since 1966, defendant Williamson since 1968. On December 3, 1970, Plesniarski was on duty from 7 p.m. to 3 a.m. the following day, that particular time being Williamson's day off. About midnight of December 4, four persons, including Monon Cherry, were arrested for "strong-arm" robbery by Sacramento police officers, one of whom was Plesniarski. Officer Emmons took Cherry to the jail on the third floor of the Hall of Justice, booking him for a violation of section 211 of the Penal Code (robbery). At about 12:25 a.m., Emmons placed Cherry in cell No. 1, otherwise known as the "tank," on the third floor. Emmons indicated that the victim of the robbery was Mary Plesniarski, wife of Officer Plesniarski.

About an hour later Emmons saw defendants Plesniarski and Williamson together on the third floor, Williamson in plain clothes and Plesniarski in uniform. Emmons saw Plesniarski remove a gun from his holster and place it in the locker where officers' weapons are stored. He also removed his flashlight and placed it on the counter. Plesniarski then asked Williamson "if he wanted to go in too, or something to that effect." The reply was "yeah." Williamson removed his gun and placed it in a gun locker. Plesniar-

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

ski got a key which was hanging on a hook on a screen surrounding the booking office and opened the door of the cell where Cherry had been placed.

One or two minutes later the two officers came out of the cell with Cherry. Plesniarski was in front of Cherry holding his left arm; Williamson was following. Cherry had his hands over his face and Emmons saw a red substance, which appeared to be blood, coming from Cherry's head. The two officers then led Cherry to a sink where they directed him to wash his face. The two officers then took Cherry to the booking counter and stood him up against the screen, a normal booking procedure, "as if to book him." Emmons then told them that Cherry had already been booked. Emmons observed some slight blood stains across Cherry's lip. When booking Cherry, Emmons observed no bleeding or any other signs of injury or damage to Cherry's face.

Any person, other than a police officer, who wished to visit the third-floor jail had to be cleared at the information center in the basement of the police department and would be given passes therefor, indicating the specific purpose of the visit and the person to be seen.

Cherry testified that Plesniarski was the officer who had taken him from the bar and placed him in the patrol car, saying, "that he didn't want to lose his temper there, that he was going to whip me when he got me to town." Cherry said that about 45 minutes after he was placed in the tank, Plesniarski and another "fellow" awakened him from a semi-slumber. Plesniarski struck him with his left fist in the left side of the face. The other man then held Cherry from behind and Plesniarski struck him in the face three or four times more. The other man let him drop to the floor and kicked him in the left side of the head. Cherry claimed that he said nothing to either man, nor did he direct any blows toward them; that he sustained injuries in this encounter and had none before he was booked in the jail.

## COLOR OF AUTHORITY

 The court, relying on *People* v. *Lantz* (1953) 120 Cal.App.2d 787 [262 P.2d 19], held that the officers were not acting under color of their authority when they assaulted the prisoner under custody in the city jail.

Section 149 of the Penal Code states, in relevant part: "Every public officer who, *under color of authority,* without lawful necessity, assaults or beats any person, is punishable . . . ." (Italics added.)

In *People* v. *Lantz, supra,* at page 792, the court held that a jailer who repeatedly entered the victim's cell and beat him was not entitled to an in-

struction under section 149 as a lesser included offense in the charge of assault by means of force likely to produce great bodily injury. The court stated, in a more or less cursory manner and without apparent consideration of the subject, "Defendant was not acting nor purporting to act under color of authority. He was not performing or purporting to perform any duty as a police officer." *Lantz* is distinguishable from the case at bench in that defendants here purported to be removing the victim from the cell to book him, and, moreover, could not have had access to the victim's cell except for their authority as police officers.

To hold, as *Lantz* did, that a police officer who unjustifiably assaults a prisoner in a cell to which only the fact that he is a police officer entitled him to get the key and enter the cell is not acting under "color of authority" is contrary to the better rule of the decisions.

■■■ The best definition of the subject and one of undoubted common sense is that in *United States* v. *Classic* (1941) 313 U.S. 299, 325 [85 L. Ed. 1368, 1383, fn. 9, 61 S.Ct. 1031], which interpreted section 242 of title 18 of the United States Code Annotated, which made criminally punishable, " 'Whoever, *under color of any law* . . . willfully subjects . . . any inhabitant . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution and the laws of the United States . . . .' " (Italics added.) ("Color of any law" obviously is synonymous with "color of authority.") In *Classic* the United States Supreme Court upheld a conviction under section 52 of title 18 of the United States Code Annotated (predecessor of § 242) of state election officials who altered and falsely counted ballots in a primary election. ■■■ The court stated: "Misuse of power, possessed by virtue of state law *and made possible only because the wrongdoer is clothed with the authority of state law,* is action taken 'under color of' state law." (P. 326 [85 L.Ed. p. 1383].) (Italics added.)

*Screws* v. *United States* (1945) 325 U.S. 91 [89 L.Ed. 1495, 65 S.Ct. 1031], after *Classic*, is a case where state police officers arrested a man on a theft charge and beat him to death after they had taken him to the courthouse square. There was evidence that one of the officers held a personal grudge toward the victim and had threatened to "get him." In upholding a conviction of the officers, the majority of the court stated at page 111 [89 L.Ed. at p. 1508]: "It is clear that under 'color' of law means under 'pretense' of law. . . . Acts of officers who undertake to perform their official duties are included *whether they hew to the line of their authority or overstep it.* If, as suggested, the statute was designed to embrace only action which the State in fact authorized, the words 'under color of any law' were hardly apt words to express the idea." (Italics added.) While the cir-

cumstances in *Screws* that the officers were making an arrest are stronger than the circumstances in the case at bench, *Screws* is important in that it approved the language in *Classic* which covers the situation in the instant case.

A significant case is *Catlette* v. *United States* (4th Cir. 1943) 132 F.2d 902. There the sheriff took into custody members of Jehovah's Witnesses who were distributing literature. Calling members of the American Legion to his office, the sheriff removed his badge and stated, in effect, that what he did thereafter would not be done in the name of the law. The captives were then forced to drink castor oil and suffer other indignities. Concerning the sheriff's contention that he was acting as a private citizen, the court said (and this is particularly applicable to the situation in the instant case), "Catlette's argument is, therefore, reduced to nothing more than the notion that an officer can divorce himself from his official capacity merely by removing his badge of office before embarking on a course of illegal conduct, and thereby blithely absolve himself from any liability for ensuing nefarious acts. We must condemn this insidious suggestion that an officer may thus lightly shuffle off his official role. To accept such legalistic dualism would gut the constitutional safeguards and render law enforcement a shameful mockery." (P. 906.) In *United States* v. *Jones* (5th Cir. 1953) 207 F.2d 785, where the defendant, an officer in a state prison, whipped prisoners for the purpose of disciplining them, the court stated that "Color of law, as used in the [federal] statute means pretense of law; it may include, but does not necessarily mean, under authority of law," (pp. 786-787) and that "the defendant was whipping these prisoners under color of law although doing it in violation of law." (P. 786.)

■ What happened in the instant case would not have happened if the officers had not the authority to go into the prisoner's cell. *Johnson* v. *Hackett* (E.D.Pa. 1968) 284 F.Supp. 933, is not in point in that the two police officers charged with violating the constitutional rights of a Negro were found not to have been acting under even "pretense of law" in offering to fight the Negro. "They were not acts these defendants could not have committed but for the cloak of the state's authority. It is not alleged that the offer to fight was in any way related to the performance of police duties." (P. 937.) The officers were not engaged in making an arrest or anything other than to challenge to fight and calling the black names. ■ Expressly relevant, however, is the following statement by the court: ". . . If the officer was enabled to do what he did because of the authority of his office, even if what he did constituted an abuse of that authority, either by the excessiveness of his conduct or because the act was not actually, although apparently, authorized, the act is under 'color of law.' Thus, . . .

abuse of persons in custody . . . have been held to be acts under 'color of law.' " (P. 937.)

In *United States* v. *Price* (1966) 383 U.S. 787 [16 L.Ed.2d 267, 86 S.Ct. 1152], Price, a deputy sheriff, released three blacks from the county jail. He followed them and intercepted their automobile, placed them in an official car, transported them to a place where 18 persons, including three police officers, beat them to death. The court held that Price, the three officers, and even the private persons were jointly engaged in acting under color of law. There are many other federal cases defining "color of law" as including actions of peace officers made possible only by virtue of their authority as peace officers or acting under pretense of law.

Defendants' fears that the construction we are putting on "color of authority" makes the term vague and uncertain are unjustified. The many federal cases, only a few of which we have cited, giving similar construction to "color of law" and determining that such construction does not make the term vague and uncertain proves defendants' fears to be unjustified. Defendants contend that not to follow *Lantz* would be to throw the term "color of authority" into the sea of indefiniteness. As set forth herein, our interpretation based upon the authorities discussed is definite and clear. An officer is acting under "color of authority" when he is performing an act which is made possible only because he is clothed with the authority of law, or when he is acting under pretense of law. These are definitions long established by federal authorities, only a few of which we have cited, in determining the meaning of "color of law" which is the same as "color of authority" and which have never given any difficulty in application, nor have they been considered uncertain or vague.

There can be no question but that defendants in the instant case did what they did only because they had the authority as police officers to take the key to the cell and go inside. In addition, they were acting under their authority to remove the prisoner from the cell for the purpose of booking him. They would have completed this act were it not for the fact that they were told, after getting him to the booking area, that he had already been booked.

In these days when there are so many unfounded charges of "police brutality," it is unfortunate that these police officers took it upon themselves to wreak personal vengeance on the man who robbed the wife of one of them, which act could not have been accomplished except for their having authority as police officers. In the rare case where such brutality occurs, it is necessary that the guilty ones not escape the more stringent penalties imposed by section 149 by the narrow interpretation of that section in

*Lantz.* The broader and better reasoned interpretation of the cases hereinbefore cited gives greater assurance that the outrageous acts of the defendants will not be repeated by others.

The proceeding before the trial court was a motion under section 995 for dismissal of the indictment. The indictment should not have been dismissed. The evidence clearly showed grounds for "assuming the possibility that an offense has been committed and the accused is guilty of it." (*Bompensiero* v. *Superior Court* (1955) 44 Cal.2d 178, 183 [281 P.2d 250].)

The judgment is reversed.

Friedman, Acting P. J., and Janes, J., concurred.