55 F.3d 1343
 100 Ed. Law Rep. 890
 Angela LARSON, a minor, by Joseph and Gail LARSON, her
father and mother and next friends, Plaintiff-Appellant,
v.
Roger MILLER; George Spilker; Harvey Bulli; The
Papillion-Lavista School District, a Political
Subdivision, Defendants-Appellees.
 No. 94-2691.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 9, 1995.
Decided May 31, 1995.
 
 Bruce G. Mason, Omaha, NE, argued (Vincent P. Sutera, on the brief), for appellant.
 John R. Douglas, Omaha, NE, argued (Terry J. Grennan, on the brief), for appellees.
 Before HANSEN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and WILL,* Senior District Judge.
 FLOYD R. GIBSON, Senior Circuit Judge.
 
 
 1
 Joseph and Gail Larson, individually and on behalf of their daughter Angela, appeal the district court's order granting the Appellees' motion for judgment notwithstanding the verdict on the Larsons' 42 U.S.C. Sec. 1983 (1988) and 42 U.S.C. Sec. 1985(3) (1988) claims and dismissing their pendant state negligence claim. We have jurisdiction under 28 U.S.C. Sec. 1291 (1988). We affirm in part and reverse in part.
 
 I. BACKGROUND
 
 2
 Viewing the evidence and reasonable inferences from the evidence in the light most favorable to the party prevailing at trial, McKnight v. Johnson Controls, Inc., 36 F.3d 1396, 1400 (8th Cir.1994), a jury could reasonably find the following facts. Angela Larson was born on December 3, 1979, and was diagnosed as anophthalmic in her left eye and microthalmic in her right eye, meaning she had no left eye and her right eye was extremely small. Because of Angela's disability, her family relocated to the Omaha metropolitan area in order to take advantage of Omaha's medical and special educational facilities. The Larsons settled within the Papillion-LaVista School District (hereafter "PLSD"), and Angela received home services until she was five years old. When Angela reached kindergarten age, PLSD contracted Angela's special educational services out to the Omaha Public Schools (District 66) due to the severity of her impairment.
 
 
 3
 When Angela was nine years old, she began attending Oakdale School, which offered a special educational program devised in part by George Spilker, PLSD's Director of Special Services. Angela's parents dropped her off each morning at the Children's Corner Day Care Center, where she was transported in a PLSD van driven by a PLSD employee to Oakdale, which was part of District 66. After school, a PLSD van would transport Angela back to Children's Corner, where she was picked up by her parents. The van driver, Eugene Szynskie, had been a part-time PLSD employee for three years before he was hired as van driver in 1986. Szynskie was interviewed by three PLSD supervisory personnel at that time, but no background check was ever conducted. The only other occupant of the van was a severely and profoundly handicapped youth who possessed minimal communicative abilities.
 
 
 4
 In the spring of 1988, Angela told her teacher, Jennie Grieb, that Szynskie had been asking her whether she had been breast fed and whether she was wearing silk panties. Grieb, a District 66 employee, promptly apprised Spilker of these inappropriate comments. Spilker passed this information on to Harvey Bulli, PLSD Director of Transportation, who in turn warned Szynskie not to engage in improper conversations with students. No further action was taken, and Szynskie continued to transport Angela to and from Oakdale without incident until January of 1989.
 
 
 5
 In the fall of 1988, Angela became increasingly withdrawn. On Friday, January 27, 1989, Angela informed her mother that Szynskie had fondled her vaginal area while putting on her seat belt. Gail Larson immediately contacted the principal at Angela's school, who contacted Spilker. Spilker in turn telephoned the Larsons later that evening. Upon learning of Angela's complaint, Spilker repeatedly warned the Larsons of the risk of slander if the charges proved to be untrue and emphasized his opinion that it would be Angela's word against the van driver's. During the conversation, Spilker also insinuated that bringing charges against Szynskie could cause problems for Angela's brother, Eric, who was a sophomore at the local high school. After speaking to the Larsons, Spilker phoned the Chief of Police, Steven Engberg, who promised to run a background check if Spilker would provide the driver's name, social security number, and date of birth.
 
 
 6
 On the morning of Monday, January 30, Spilker met with PLSD officials, including both Bulli and PLSD Superintendent Roger Miller, in order to apprise them of Angela's complaint. Miller promptly reassigned Szynskie to warehouse duty pending the results of the background check and instructed Spilker to inform the Larsons of the reassignment. Miller then instructed the PLSD Director of Personnel to supply Chief Engberg with the information necessary to complete the background check, which he did. Pursuant to Miller's instructions, Spilker telephoned the Larsons, informed them of Szynskie's reassignment, and told them that they were awaiting the results of the background check. Spilker reiterated his warning regarding the likelihood of a slander suit should they go public with their allegations. Later that morning, Spilker telephoned Gail Larson a second time, reiterated his warning regarding slander, and told her that, according to Bulli, "Angie gave sexual comments to any and all of the substitute drivers, that they all said she gave sexual comments to them." Angie's mother reacted heatedly to this information, saying, "Come on, George, you know that children do not give sexual comments at that age."
 
 
 7
 Later that evening, the Larsons held a family meeting in which they discussed their options. Based on Spilker's statements, the Larsons assumed they could be sued for slander if they reported Szynskie to the authorities. In addition, they feared some form of retaliation against their son at the local high school. After Joseph and Gail Larson explained the situation to their son, the family decided to contact an attorney in order to "find out about the slander." After being informed that they were shielded from liability if they reported Szynskie to the authorities, Joseph and Gail Larson decided to report him the next day.
 
 
 8
 Meanwhile, a computer check revealed that Szynskie had been previously arrested for sexual abuse of his step-daughter, but the charges had been dismissed. Upon receiving this information on either Tuesday January 31st or Wednesday, February 1st, Miller, Spilker, and Bulli met again, and Miller decided to terminate Szynskie's employment. Miller instructed Spilker to inform the Larsons that Szynskie had been terminated, but ordered Spilker not to divulge the results of the background check. Later that day, Spilker informed the Larsons, pursuant to Miller's directives, that PLSD had terminated Szynskie. Spilker told them that PLSD would not be filing criminal charges and said that the background check had revealed "nothing pertinent to the case." During this conversation, Spilker repeatedly emphasized the risk of slander and reiterated the theme that it would be Angela's words against the driver's.
 
 
 9
 The Larsons contacted law enforcement authorities on Tuesday, January 31st. Szynskie was subsequently charged and convicted of two Class IV felony counts of sexual assault of a minor child, Angela Larson. Six months after the incident, Spilker asked Chief Engberg to approve a press release stating that PLSD had reported the alleged abuse on Friday the 27th of January. Engberg refused to approve the release, stating that their conversation that night did not constitute a report in his view.
 
 
 10
 Angela and her parents sued PLSD, Miller, Spilker, and Bulli, alleging that PLSD and the individual defendants had deprived Angela of her civil rights under 42 U.S.C. Sec. 1983 (1988) and had conspired to deny Angela and her family's civil rights under 42 U.S.C. Sec. 1985(3) (1988). The complaint also included a pendant state negligence claim. After a trial on the Larsons' constitutional claims, the jury returned a verdict in favor of the Larsons, awarding $80,001.00 in compensatory damages and $395,001.00 in punitive damages. The pendant negligence claim was taken under submission by the district court, pursuant to Neb.Rev.Stat. Sec. 13-907 (Reissue 1991).[1] The defendants filed a timely motion for judgment notwithstanding verdict/judgment as a matter of law[2] pursuant to Fed.R.Civ.P. 50.[3] The district court granted the motion, setting aside the jury verdicts and entering judgment in favor of the defendants on the constitutional claims. The district court also entered judgment in favor of the defendants on the pendant tort claim, dismissing the Larsons' complaint. The Larsons appeal.
 
 II. DISCUSSION
 
 11
 We review the district court's entry of judgment notwithstanding verdict/judgment as a matter of law in the light most favorable to the party who prevailed before the jury. City of Omaha Employees Betterment Ass'n v. City of Omaha, 883 F.2d 650, 651 (8th Cir.1989). This standard requires this Court to:
 
 
 12
 (1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tended to prove, (3) give the nonmovant the benefit of all reasonable inferences, and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.
 
 
 13
 Pumps and Power Co. v. Southern States Indus., 787 F.2d 1252, 1258 (8th Cir.1986) (quotation omitted).
 
 A. 42 U.S.C. Sec. 1983
 
 14
 The Larsons' Sec. 1983[4] claim alleges that PLSD and the individual defendants denied Angela's civil rights by failing to receive, investigate, and act upon Angela's prior complaint and by failing to adequately train its employees in the prevention and reporting of the abuse of handicapped children. We address each argument in turn.
 
 1. Failure to Receive, Investigate, and Act
 
 15
 The individual defendants are subject to personal liability under Sec. 1983 for failure to adequately respond to the known risk of physical and emotional harm presented by Szynskie if it can be proven that they: (1) received notice of a pattern of unconstitutional acts committed by subordinates; (2) demonstrated deliberate indifference to or tacit authorization of the offensive acts; (3) failed to take sufficient remedial action; and (4) that such failure proximately caused injury to the plaintiff. Jane Doe A By and Through Jane Doe B v. Special Sch. Dist., 901 F.2d 642, 645 (8th Cir.1990).
 
 
 16
 In order to state a cause of action against PLSD, the Larsons must prove "the existence of a governmental custom of failing to receive, investigate, and act upon complaints of violations of constitutional rights...." Thelma D. by Dolores A. v. Board of Educ., 934 F.2d 929, 932 (8th Cir.1991). In order to prove such a custom, they must show: (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that the plaintiff was injured by acts pursuant to the governmental entity's custom, i.e. that the custom was the moving force behind the constitutional violation. Jane Doe A, 901 F.2d at 646.
 
 
 17
 In its memorandum opinion, the district court concluded that, giving the Larsons the benefit of all reasonable inferences, "the evidence presented at trial simply does not suggest that any pattern of unconstitutional behavior existed and the verdict must be overturned against both the school district and the individual defendants." We agree. The Larsons can point to only one prior complaint regarding Szynskie's behavior toward Angela. In previous Sec. 1983 actions against school officials, this Court has found far more extensive records of unheeded prior complaints insufficient to constitute a pattern of unconstitutional behavior. See Jane Doe A, 901 F.2d at 644, 646 (district employees received complaints over the course of two years that bus driver had used foul language, physically restrained and assaulted children, kissed a child, placed his hand down a boy's pants, and touched boys' crotches); Thelma D., 934 F.2d at 933 ("five complaints scattered over sixteen years cannot, as a matter of law, be said to comprise a persistent and widespread pattern of unconstitutional misconduct."). Accordingly, we believe that the district court correctly found that there was no evidence of a pattern of unconstitutional behavior.
 
 2. Failure to Train
 
 18
 To establish liability on the part of the PLSD for its failure to adequately train its employees to report and prevent the sexual abuse of handicapped children, the Larsons must prove that PLSD's "failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of the students." Thelma D., 934 F.2d at 934 (quoting City of Canton v. Harris, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989)). The Larsons must prove that PLSD "had notice that its procedures were inadequate and likely to result in a violation of constitutional rights." Id. As the Larsons accurately point out, a pattern of unconstitutional behavior is not required where the failure to train employees is so likely to result in a violation of constitutional rights that the need for training is patently obvious. Id.
 
 
 19
 We find, however, no evidence to support the Larsons' claim that PLSD employees received inadequate training. The evidence is uncontroverted that PLSD required its employees to report all suspected cases of child abuse to the proper jurisdictional law enforcement authority pursuant to the State of Nebraska's rigid reporting statute. In addition, PLSD repeatedly held meetings between its employees and law enforcement officers from all five law enforcement agencies serving PLSD in order enhance communication between PLSD and law enforcement, develop strategies for reporting child abuse, and determine how to follow up on reports of alleged child abuse. Faced with similar facts in Jane Doe A, this Court found no evidence of "deliberate indifference to the rights of the handicapped children in the District's training program for bus drivers, teachers, supervisors, and bus aides." Jane Doe A., 901 F.2d at 646. As this Court concluded in Thelma D., the District "has developed and implemented policies and procedures for handling complaints of sexual abuse." Thelma D., 934 F.2d at 934. We conclude that the Larsons have not produced sufficient evidence to support a Sec. 1983 action based on PLSD's failure to train its employees.
 
 B. 42 U.S.C. Sec. 1985(3)
 
 20
 The Larsons' 1985(3)[5] claim alleges that the individual defendants, animated by an invidiously discriminatory animus against handicapped females, conspired to deny the Larsons' First and Fourteenth Amendment rights by preventing them from reporting Angela's abuse. In order to prove the existence of a civil rights conspiracy under Sec. 1985(3), the Larsons must prove: (1) that the defendants did conspire; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws, that one or more of the conspirators; (3) did, or caused to be done, any act in furtherance of the object of the conspiracy, whereby another person was; (4a) injured in his person or property or (4b) deprived of having and exercising any right or privilege of a citizen of the United States. Marquart v. Lodge 837, 26 F.3d 842, 853-54 (8th Cir.1994).
 
 
 21
 After the jury returned special verdicts against Spilker and Miller, the district court granted the defendants' motion for judgment as a matter of law. The district court concluded that the Larsons had failed to present "any evidence from which the jury could infer that Spilker and Miller agreed to deprive the Larsons of their rights under the first or fourteenth amendments. Nor does the evidence support the jury's finding that Spilker and Miller were motivated by an invidiously discriminatory animus toward handicapped females." Even if there were sufficient evidence to support the Larsons' conspiracy allegations, the district court concluded that their claim was barred by the intracorporate conspiracy doctrine. We address each point in turn.
 
 1. Evidence of Conspiracy
 
 22
 We have defined a civil conspiracy as "a combination of two or more persons acting in concert to commit an unlawful act or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another and an overt act that results in damage." Rotermund v. United States Steel Corp., 474 F.2d 1139, 1145 (8th Cir.1973) (quotations omitted). In order to prove the existence of a conspiracy under Sec. 1985(3), the Larsons "must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement." City of Omaha Employees Betterment Ass'n, 883 F.2d at 652 (citation omitted). That may be accomplished by "point[ing] to at least some facts which would suggest that appellees reached an understanding to violate [their] rights." Id. (quotations omitted). The Larsons need not show that each participant knew the "exact limits of the illegal plan...." Hampton v. Hanrahan, 600 F.2d 600, 621 (7th Cir.1979) (quotation omitted), rev'd in part on other grounds, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980). The question of the existence of a conspiracy to deprive the plaintiffs of their constitutional rights "should not be taken from the jury if there is a possibility the jury could infer from the circumstances a 'meeting of the minds' or understanding among the conspirators to achieve the conspiracy's aims." Putman v. Gerloff, 701 F.2d 63, 65 (8th Cir.1983) (quoting Hampton, 600 F.2d at 621).
 
 
 23
 We believe there was adequate circumstantial evidence of a conspiracy between Spilker and Miller to support the jury's verdict. The evidence is clear that, beginning on Monday, January 30th, Spilker and Miller were in constant communication regarding Angela's allegations, and that Miller repeatedly directed Spilker to pass certain information onto the Larsons while withholding other information. Following each meeting, Spilker reiterated what could be interpreted as veiled threats regarding slander liability, Angela's credibility, and the effect that going public with the charges would have on Angela's brother. Spilker also told Gail Larson that he had learned in the course of a meeting with Bulli and Miller that Angela was the one instigating the sexual comments. In short, we believe the Larsons produced sufficient evidence to allow the jury to reasonably infer that Miller and Spilker had reached an understanding to violate their civil rights.
 
 2. Invidiously Discriminatory Animus
 
 24
 In Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the Supreme Court determined that a Sec. 1985(3) plaintiff must show that "some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action." Id. at 102, 91 S.Ct. at 1798. In that decision, the Court specifically declined to determine whether Sec. 1985(3)'s protection extends to non-racially-motivated conspiracies. Id. at 102, n. 9, 91 S.Ct. at 1798, n. 9. In United Bhd. of Carpenters and Joiners of America, Local 610 AFL-CIO v. Scott, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983), the Court recognized that "it is a close question whether Sec. 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause, most notably Republicans," but once again declined to reach the issue. Id. at 835-36, 103 S.Ct. at 3360.
 
 
 25
 We believe Sec. 1985(3)'s reach extends beyond racial animus. The plain language of the statute defends "any person" against the deprivation of equal protection under the law. 42 U.S.C. Sec. 1985(3). We realize that Sec. 1985(3) was promulgated for the specific purpose of safeguarding the civil rights of blacks from the rampant abuses of the Ku Klux Klan and other white supremacists common to the Reconstructionist South. Scott, 463 U.S. at 835-37, 103 S.Ct. at 3359-61. The same may be said, however, of the Thirteenth and Fourteenth Amendments, which are now universally applicable to all citizens. See Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 669, 86 S.Ct. 1079, 1082, 16 L.Ed.2d 169 (1966). The approach of the Supreme Court to "other Reconstruction civil rights statutes" has been to " 'accord [them] a sweep as broad as [their] language.' " Griffin, 403 U.S. at 97, 91 S.Ct. at 1796 (quoting United States v. Price, 383 U.S. 787, 801, 86 S.Ct. 1152, 1160, 16 L.Ed.2d 267 (1966)). We are also persuaded by the statute's legislative history, which reveals a broader congressional intent to extend Sec. 1985(3)'s sweep to diverse classifications beyond race:
 
 
 26
 [if] it should appear that this conspiracy was formed against this man because he was a Democrat, if you please, or because he was a Catholic, or because he was a Methodist, or because he was a Vermonter, ... then this section should reach it.
 
 
 27
 Senator Edmunds, Cong. Globe 42d Cong., 1st Sess., at 567 (1871). Based on the Supreme Court's decision in Griffin, courts have held that Sec. 1985(3) protection extends to " 'discrete and insular' minorities that receive special protection under the Equal Protection Clause because of inherent personal characteristics," Browder v. Tipton, 630 F.2d 1149, 1150 (6th Cir.1980), or well-defined, traditionally disadvantaged groups. Orshan v. Anker, 489 F.Supp. 820, 823 (E.D.N.Y.1980). While recognizing that "there is significant confusion over what classes are protected under Sec. 1985[ (3) ]," this Court has observed, "[m]ost courts have extended protection to other suspect-like classes...." Shortbull v. Looking Elk, 677 F.2d 645, 649 (8th Cir.), cert. denied, 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 168 (1982).
 
 
 28
 Having determined that Sec. 1985(3)'s scope is not limited to racially motivated conspiracies, there can be little doubt that Sec. 1985(3)'s protection extends to women as a class, and particularly to handicapped young girls. We begin by observing that women as a class enjoy a heightened scrutiny of state action under the Equal Protection Clause of the Fourteenth Amendment. E.g., Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 723-26, 102 S.Ct. 3331, 3335-37, 73 L.Ed.2d 1090 (1982). The Supreme Court "has implicitly held that discrimination on the basis of sex is sufficient under [Sec. 1985(3) ]." Shortbull, 677 F.2d at 648 (citing Great Am. Fed. Savings & Loan Ass'n v. Novotny, 442 U.S. 366, 389 n. 6, 99 S.Ct. 2345, 2357 n. 6, 60 L.Ed.2d 957 (1979) (White, J., dissenting)). In Conroy v. Conroy, 575 F.2d 175, 177 (8th Cir.1978), this Circuit concluded that allegations of conspiracy based on race and sex was sufficient to state a cause of action under Sec. 1985(3). Six other circuits that have reached this issue have concluded that Sec. 1985(3) applies to females as a class. Stathos v. Bowden, 728 F.2d 15, 20 (1st Cir.1984); New York State National Organization for Women v. Terry, 886 F.2d 1339, 1359 (2d Cir.1989), cert. denied, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990); Novotny v. Great American Fed. Sav. Loan Ass'n, 584 F.2d 1235, 1243-44 (3d Cir.1978) (en banc ), vacated on other grounds, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979); National Organization for Women v. Operation Rescue, 914 F.2d 582, 585 (4th Cir.1990); Volk v. Coler, 845 F.2d 1422, 1434 (7th Cir.1988); Life Ins. Co. of North America v. Reichardt, 591 F.2d 499, 505 (9th Cir.1979).
 
 
 29
 We believe that Sec. 1985(3)'s protection extends to the handicapped as a class as well as to females. We realize that some courts have hesitated to apply Sec. 1985(3) to conspiracies motivated by invidiously discriminatory animus against handicapped persons. D'Amato v. Wisconsin Gas Co., 760 F.2d 1474, 1486 (7th Cir.1985) ("The legislative history of Section 1985(3) does not suggest a concern for the handicapped."); Wilhelm v. Continental Title Co., 720 F.2d 1173, 1177 (10th Cir.1983), cert. denied, 465 U.S. 1103, 104 S.Ct. 1601, 80 L.Ed.2d 131 (1984) ("a class of 'handicapped persons' was not in the contemplation of Congress in 1871, and was not included as a class in what is now Sec. 1985(3)"). Other courts, however, have not hesitated to extend Sec. 1985(3)'s protection to handicapped individuals as a class. In People by Abrams v. 11 Cornwell Co., 695 F.2d 34 (2d Cir.1982), the Second Circuit extended Sec. 1985(3) protection to the class of mentally retarded individuals, noting that "[c]ases since Griffin v. Breckenridge have been generous in applying section 1985(3) to nonracial classifications, even though some of the classifications would not receive strict scrutiny under the equal protection clause." Id. at 42. See also Trautz v. Weisman, 819 F.Supp. 282, 290-295 (S.D.N.Y.1993); Tyus v. Ohio Dept. of Youth Services, 606 F.Supp. 239, 245-47 (S.D.Ohio 1985).
 
 
 30
 With due respect to the Seventh and Tenth Circuits, we agree with the Second Circuit's conclusion that Sec. 1985(3) encompasses conspiracies motivated by an invidious discriminatory animus against the handicapped as a class. While cases such as D'Amato reject the handicapped as a class that has historically faced invidious discrimination, 760 F.2d at 1486, Congress' passage of the Americans With Disabilities Act convinces us otherwise. Specifically, we look to Congress' finding that:
 
 
 31
 individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society.
 
 
 32
 42 U.S.C. Sec. 12101(a)(7). This Court has readily extended Sec. 1985(3) protection to a wide range of plaintiffs in the past. Action v. Gannon, 450 F.2d 1227, 1232 (8th Cir.1971) (en banc) (Sec. 1985(3) protects predominantly white churchgoers against disruption by black protesters); Means v. Wilson, 522 F.2d 833, 839 (8th Cir.1975), cert. denied, 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976) (Sec. 1985(3) protects the supporters of opposition candidate in Native American tribal elections). The handicapped, identifiable through the immutable physical characteristics of their individual handicaps, face the same type of invidious discrimination which Sec. 1985(3) was implemented to prevent. As such, we have no difficulty identifying the handicapped as a protected class for purposes of Sec. 1985(3).
 
 
 33
 Having concluded that Sec. 1985(3) applies to both females and the handicapped as a class, we believe the evidence was sufficient to allow the jury to infer that Miller and Spilker acted from an invidiously discriminatory animus against handicapped females. Although Judge Hansen's dissent characterizes their actions and comments as cautionary, we believe the jury could reasonably find that Spilker and Miller's actions and comments reflect the type of discriminatory animus required by Griffin, 403 U.S. at 102, 91 S.Ct. at 1798. While the dissent emphasizes Spilker's outstanding career as a special educator and PLSD's need to investigate cautiously, that rebuttal evidence was fairly heard and rejected by the jury. And whereas the dissent excuses Spilker's inflammatory comments as sound "non-lawyer legal advice," we decline to discount such potentially obstructionist statements as innocuous, especially when such statements come from PLSD's Director of Special Services, the primary district official upon whom the Larsons should have been able to rely to protect Angela's interests. The question before us is not whether this Court, had it been the finder-of fact, would have reached the same conclusions as the jury. Our role is merely to determine whether the jury's verdict was based on pure speculation or reasonable inferences gathered from the entirety of the record. Viewed in the light most favorable to the verdict, Spilker's comments, combined with Miller's relative inaction, reflect a callous disregard of Angela's condition and the validity of her complaint. As such, we cannot say that the decision of the jury, which was able to assess the credibility and observe the demeanor of the witnesses, was based entirely on speculation.
 
 3. Intracorporate Conspiracy Doctrine
 
 34
 Under the intracorporate conspiracy doctrine, a corporation cannot conspire with itself through its agents when the acts of the agents are within the scope of their employment. Runs After v. United States, 766 F.2d 347, 354 (8th Cir.1985). This Court has held that the intracorporate conspiracy doctrine is equally applicable to governmental entities such as school districts. Id. at 354. This Court has also, however, rejected the applicability of this doctrine to Sec. 1985(3) actions where the individual defendants "act outside the scope of their employment for personal reasons." Garza v. City of Omaha, 814 F.2d 553, 556 (8th Cir.1987). Such "personal reasons" include "acting to further their personal bias" in violation of 42 U.S.C. Sec. 1985(3). Id. at 556-57. We believe that there was ample evidence that Spilker and Miller were acting outside the scope of their employment for personal reasons, namely an invidiously discriminatory animus against minor handicapped females. As such, the intracorporate conspiracy doctrine is inapplicable. In sum, we believe the district court erroneously granted the defendants' motion for judgment as a matter of law on the Larsons' Sec. 1985(3) claim.
 
 4. Punitive Damages
 
 35
 The jury awarded Angela Larson and her parents $100,000.00 and $10,000.00, respectively, in punitive damages against Miller and Spilker. Miller and Spilker contend that they are not liable for punitive damages under Sec. 1985(3) because they were acting in their official capacity. It is true that a suit against a government employee in his or her official capacity is the equivalent of a suit against the municipality itself. Parrish v. Luckie, 963 F.2d 201, 203 n. 1 (8th Cir.1992). It is also true that a municipality is not liable for punitive damages under Sec. 1983. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981). We have, however, construed the Larsons' complaint to state a cause of action against Miller and Spilker in their individual capacities. As such, their argument is without merit.
 
 
 36
 C. The Nebraska Political Subdivision Tort Claims Act
 
 
 37
 The Larsons' pendant state negligence claim alleges that PLSD and the individual defendants failed to adequately supervise and screen their employees, failed to protect Angela, failed to investigate the prior complaint against Szynskie, and failed to follow PLSD's established guidelines and procedures. The district court dismissed the Larsons' pendant negligence claim, concluding that it was barred by the discretionary function exception to the Nebraska Political Subdivisions Tort Claim Act. We review the district court's determination of state law de novo, and "when de novo review is compelled, no form of appellate deference is acceptable." Salve Regina College v. Russell, 499 U.S. 225, 231, 238, 111 S.Ct. 1217, 1221, 1224, 113 L.Ed.2d 190 (1991).
 
 
 38
 The Nebraska Political Subdivision Tort Claims Act, Neb.Rev.Stat. Sec. 13-905 (Reissue 1991), et seq., represents a limited waiver of governmental immunity, under which a plaintiff may recover for injuries caused by the negligence of the subdivision's officers, agents, and employees. Under the discretionary functions exception, however, a plaintiff may not recover for a claim "based upon the exercise or performance of or the failure to exercise or perform a discretionary function or duty on the part of the political subdivision or an employee of the political subdivision, whether or not the discretion is abused." Neb.Rev.Stat. Sec. 13-910(2) (Reissue 1993).
 
 
 39
 The applicability of the discretionary function exception turns on "the conduct in question, not on the identity of the actor...." Lemke v. Metropolitan Utilities Dist., 243 Neb. 633, 502 N.W.2d 80, 87 (1993) (quotation omitted). An element of judgment or choice is "essential and indispensable" for discretionary conduct to be exempted from liability. Id. As the Supreme Court of Nebraska noted, "the discretionary functions exception will not apply when a ... statute, regulation, or policy specifically prescribes a course of action for an employee to follow." Jasa By and Through Jasa v. Douglas County, 244 Neb. 944, 510 N.W.2d 281, 289 (1994).
 
 
 40
 The Supreme Court of Nebraska has carefully distinguished discretionary functions from ministerial acts. Where a government employee "must make a judgmental decision within a regulatory framework, such decision is distinguishable from a ministerial act." A ministerial act has been defined as "one which a person performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to, or the exercise of, his own judgment upon the propriety of the act being done." Jasa, 510 N.W.2d at 290 (quotations omitted).
 
 
 41
 While we agree with the district court's assessment that decisions to "investigate, hire, fire, and retain" employees are generally discretionary, the Larsons' negligence claim also alleges the dereliction of purely ministerial acts. Their claim necessarily raises the issue of whether Miller negligently failed to follow PLSD's established policy on the reporting of suspected sexual abuse of students which had been in effect since 1987.[6] That policy directs the superintendent to formulate a procedure to be followed by PLSD officials in the reporting of suspected child abuse or neglect. At trial, Miller flatly admitted that he had failed to develop any such procedures. This failure to follow PLSD's established policy represents the violation of a ministerial duty, not the type of incorrect policy decision protected by the discretionary function exception.
 
 
 42
 The Larsons' claim also raises the issue of whether the defendants' failure to investigate and act on Angela's complaint violated Nebraska's reporting statute which requires all persons "[having] reasonable cause to believe that a child has been subjected to conditions or circumstances which reasonably would result in abuse or neglect" to "report such incident or cause a report to be made to the proper law enforcement agency...." Neb.Rev.Stat. Sec. 28-711 (Reissue 1989). While the determination of "reasonable cause" certainly qualifies as a discretionary function, PLSD's failure to follow the clear mandate of the Nebraska reporting statute despite the existence of "reasonable cause" represents the dereliction of a ministerial duty.
 
 
 43
 To the extent that the Larsons' claim implicates a negligent failure to develop procedures for reporting suspected child abuse pursuant to PLSD's established policy or a negligent failure to comply with the Nebraska reporting statute despite the existence of "reasonable cause" to suspect child abuse, we conclude that their claim involves strictly ministerial acts, and, as such, is not barred by the discretionary function exception to the Nebraska Political Subdivisions Tort Claims Act.
 
 III. CONCLUSION
 
 44
 For the aforementioned reasons, we affirm the district court's order with respect to the Larsons' 42 U.S.C. Sec. 1983 claim. We reverse the district court's order with respect to the 42 U.S.C. Sec. 1985(3) claim and remand with instructions to reinstate the jury's verdict and enter judgment of $25,000.00 in compensatory and $100,000.00 in punitive damages to Angela and $10,000.00 in punitive damages to her parents. Finally, we reverse the district court's order dismissing the pendant state negligence claim to the extent that the complaint alleges a failure to follow and comply with PLSD's established policy on the prevention and reporting of child abuse or a failure to comply with the Nebraska reporting statute, and remand it to the district court for further consideration.
 
 
 45
 HANSEN, Circuit Judge, concurring in part and dissenting in part.
 
 
 46
 I concur in the court's judgment with respect to the plaintiffs' Sec. 1983 claim. I respectfully dissent from the court's judgment concerning the Sec. 1985(3) claims and the pendant state law cause of action.
 
 
 47
 After carefully reading the testimony offered at trial, I conclude that the experienced district judge's granting of the defendants' posttrial motion for judgment as a matter of law was correct. In my judgment, there is woefully insufficient evidence from which a reasonable jury could find a civil rights conspiracy between the school district superintendent, Mr. Miller, and the Director of Special Services, Mr. Spilker, to deprive Angela or her parents of any constitutional rights. Consequently, I would not find it necessary to decide the expanded reach of Sec. 1985(3) as the court does today.
 
 
 48
 With respect to the January 1989 touching incident between the van driver, Mr. Szynskie, and Angela, the evidence of record viewed in the light most favorable to the verdict shows the following: Angela's first report of the event was to her mother as they were en route home from piano lessons on Thursday evening, January 26, 1989. On Friday morning, January 27, Mrs. Larson called Mr. Bullie, PLSD's Transportation Director, to tell him that Angela would not be riding the van that day. She did not report the incident to Mr. Bullie (who was the accused driver's supervisor) or to any other school official at PLSD. Instead, she called Mr. Carr at Angela's Oakdale School (not a part of the PLSD) and informed him. Mr. Carr, knowing that Mr. Spilker would be at a meeting in Lincoln, Nebraska, that day which one of Carr's colleagues was also attending, arranged for the colleague to pass Mrs. Larson's information on to Mr. Spilker at the Lincoln meeting.
 
 
 49
 The Larsons and Mr. Spilker lived in the same neighborhood and had known each other for years. Mr. Spilker has spent more than 25 years as an educator of special needs children, he supervises the education of over 600 special education students, and he has been personally involved in developing and implementing Angela's individual education plan since she was two years old. When Angela was not progressing to her parents' satisfaction in a placement in the Omaha public schools, it was Mr. Spilker who arranged for an outside vision consultant to observe and evaluate Angela, and it was Mr. Spilker who arranged for her placement in a school where she has done quite well.
 
 
 50
 When Spilker returned to Omaha from Lincoln Friday evening, he called the Larsons and was informed by Mrs. Larson about what Angela had told her. Mr. Spilker did caution the Larsons about broadcasting the allegations which might bring on a slander suit by the driver and told the Larsons that the matter was a serious one which pitted Angela's word against the driver's. He told them he would contact the local Chief of Police (also a neighbor) and then contact the Larsons again. He called Chief Engberg and, without divulging any names, discussed the matter in general terms.
 
 
 51
 On Monday morning, Superintendent Miller held his regular staff conference at 9:00 a.m. He was informed by Mr. Spilker of Angela's allegations and of the need for a criminal records check. Miller gave orders that removed Szynskie from his van driving job and assigned him to warehouse duty pending further investigation. He also directed the assistant superintendent for personnel to provide Szynskie's name, date of birth, and social security number to the Chief of Police for a records check. He told Spilker to tell the Larsons what was being done. Spilker did so in a 9:30 a.m. phone call to Mrs. Larson, who testified that Spilker called and told her they had taken Szynskie off the van and that they were going to do a criminal records check. According to Mrs. Larson, he also reiterated that it was Angela's word against Szynskie's. Mrs. Larson also testified that Spilker called her a second time on Monday to tell her that the other van drivers had reported that Angela had made sexual comments to them. Mrs. Larson became irate, called her husband and told him of Spilker's second call. He, too, became incensed. The Larsons concluded that "the tables were being turned" on Angela because she was a handicapped female who was making a complaint of sexual abuse.
 
 
 52
 Mrs. Larson called Mr. Spilker at home about 7:00 p.m. on Monday night to tell him the Larsons would not be utilizing the school van until the matter was settled. She says that Spilker once again told her it was Angela's word against the driver's and that there was the risk of a slander suit by Szynskie. The Larsons then called their personal attorney who told them the Nebraska child abuse reporting statute gave them protection from civil suits for reporting the matter to police authorities. The Larsons decided then to call the prosecuting authorities the next morning.
 
 
 53
 Early the next morning, Mr. Larson called the Sarpy County Attorney's office. That office refused to take the complaint and told him to call the police. Mrs. Larson then called a local police officer whom she knew and made a report of Angela's incident with Szynskie. The officer immediately deduced that the touching had occurred at a location outside of his jurisdiction, and he called the sheriff's office who sent investigators. Szynskie was charged some three weeks later, convicted after a trial, and sentenced to jail.
 
 
 54
 While Mrs. Larson was reporting the matter to the police department on Tuesday morning, the school district was terminating Szynskie's employment. The Chief of Police had reported back that Szynskie had a previous arrest but no conviction for an alleged sexual assault on his stepdaughter. The Chief also had told the school authorities that the arrest information was confidential. Superintendent Miller instructed Spilker to tell the Larsons that the school had terminated the driver, that the police had done a records check (without revealing the results), and that the law enforcement authorities would have to prosecute the case, not the school district. Spilker did so.
 
 
 55
 Both of the Larsons testified that they made no report themselves to law enforcement officials until Tuesday morning, and that they had waited over the previous weekend to see what the school authorities would do. They decided to report the matter themselves after conferring with their attorney at about 9:00 p.m. on Monday night.
 
 
 56
 The trial court submitted the Sec. 1985(3) conspiracy claim to the jury under instructions which required the jury to find that the defendants had a discriminatory intent to deny the Larsons their "First Amendment rights or the equal protection of the laws under Nebraska law to report to law enforcement upon behalf of their minor daughter the sexual molestation of their daughter by a school employee." (Inst. 19.)
 
 
 57
 The record is absolutely devoid of any evidence tending to show that Miller or Spilker harbors any invidious discriminatory animus towards handicapped females. The court's opinion concludes that "the evidence was sufficient to allow the jury to infer that Miller and Spilker acted from an invidiously discriminatory animus against handicapped females," supra at 1353, but points to no evidence, and I am unable to find any, from which such an inference could reasonably be drawn. Neither does the record show that the Larsons' ability or opportunity to report the matter to law enforcement was impeded in any significant way. Spilker's non-lawyer legal advice to them "not to go running out in the streets telling everybody," as Angela's father recounted it, or "that we cannot run out and start telling everyone about this--that we have to be very careful," as Mrs. Larson testified, contained no advice to not report the matter to law enforcement authorities. On the contrary, Mr. Spilker told the Larsons they were free to do so when he told them the school district was not going to press the charges. Indeed, as I read the Nebraska Revised Statutes Sec. 28-716 (Reissue 1989), immunity from civil liability exists only for a person who participates in an investigation of child abuse or who makes a report to law enforcement authorities of suspected child abuse upon reasonable cause to believe a child has been subjected to abuse. The statute provides no protection for the kind of general publication of the allegations that Spilker warned against. There can be no liability under Sec. 1985 absent some evidence that the defendants' actions either caused injury to the plaintiffs or deprived the plaintiffs of exercising some right or privilege granted them as United States Citizens. None appears here.
 
 
 58
 Nebraska Revised Statutes Sec. 28-711 (Reissue 1989) requires any "school employee ... or other person [who] has reasonable cause to believe that a child has been subjected to abuse [to] report such incident or cause a report to be made to the proper law enforcement agency or to the Department [of Social Services]." Consequently, the Larsons themselves were under as great a duty to report Angela's allegations (which they reasonably believed to be true) to law enforcement as any school official whom they informed. At most, the evidence shows that the Larsons waited on their own motion from Monday morning until Monday evening for word that the school officials were going to formally report the matter to the police before they decided to report it themselves. Indeed, Mr. Larson testified that their main concern was that the accused driver not be permitted to be in contact with school children, a result accomplished the first thing Monday morning when Superintendent Miller was informed of the matter and ordered Szynskie off van duty and into the warehouse.
 
 
 59
 I respectfully disagree with our court's conclusion that the evidence is clear that Mr. Miller and Mr. Spilker "were in constant communication regarding Angela's allegations and that Miller repeatedly directed Spilker to pass certain information onto the Larsons while withholding other information." Supra at 1351. There is no showing of a constancy of communication between the two school officials, and the only information Miller directed Spilker not to pass on to the Larsons was the information about Szynskie's prior arrest--information that Miller reasonably believed was obtained in confidence from the Chief of Police. In all other respects, Miller directed Spilker to inform the Larsons of everything the school authorities had done and were doing. The Larsons learned about Szynskie's prior arrest while at the sheriff's office at about the same time the school officials learned about it from the Chief of Police.
 
 
 60
 I also respectfully disagree with our court's conclusion that Superintendent Miller and Mr. Spilker were not acting throughout in their official capacities. They were contacted by the Larsons strictly because they were school officials, and every action each of them took thereafter was taken in their capacity as school officials. Accordingly, the punitive damage awards against them should not be allowed to stand because, as the court notes, a suit against a government official in his official capacity is a suit against the municipality itself, see Parrish v. Luckie, 963 F.2d 201, 203 n. 1 (8th Cir.1992), and a municipality is not liable for punitive damages under Sec. 1985, see Bell v. City of Milwaukee, 746 F.2d 1205, 1270-71 (7th Cir.1984).
 
 
 61
 Because I am convinced that all of the actions taken by the defendants were taken within the scope of their official employment, even if our court's view of the evidence on the conspiracy claim is correct, I would still affirm the district court's application of the intracorporate conspiracy doctrine in this case.
 
 
 62
 With respect to the plaintiffs' claim under the Nebraska Political Subdivision Tort Claims Act, I agree with the court's conclusion that a school district's decisions to "investigate, hire, fire, and retain" employees are generally discretionary and hence not actionable under the state statute. I disagree with the court's conclusion that the issue of Superintendent Miller's failure to follow the school district's established policy of reporting suspected sexual abuse states a claim under the state tort claim statute. The school's stated policy required compliance with the Nebraska state child abuse reporting law. That law, as quoted above, requires any person to report suspected child abuse if the person has "reasonable cause" to believe a child has been subjected to child abuse. The determination of "reasonable cause" certainly entails the making of a judgmental decision, which in my view takes the matter out of the realm of a ministerial act. I would affirm the district court on this state law issue as well.
 
 
 63
 In sum, because the evidence is wholly insufficient (if not nonexistent) to support the jury's verdicts on the plaintiffs' asserted Sec. 1985(3) claim, I would affirm the judgment of the district court on that claim without deciding whether or not the reach of Sec. 1985(3) is as broad as the court today determines. I would also, for the other reasons set forth, affirm the district court's judgment in toto.
 
 
 
 *
 The Honorable Hubert L. Will, Senior United States District Judge for the Northern District of Illinois, sitting by designation
 
 
 [1]
 Neb.Rev.Stat. Sec. 13-907 (Reissue 1991):
 Jurisdiction, venue, procedure, and rights of appeal in all suits brought under sections 13-901 to 13-926, and 16-727, 16-728, 23-175, 39-809, and 79-489 shall be determined in the same manner as if the suits involved private individuals, except that such suits shall be heard and determined by the appropriate court without a jury.
 
 
 [2]
 Fed.R.Civ.P. 50(a) Judgment as a Matter of Law
 (1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.
 
 
 [3]
 A motion for judgment as a matter of law now encompasses all motions labeled as motions for judgment notwithstanding the verdict or motions for a directed verdict. Fed.R.Civ.P. 50 (commentary). Consequently, we will apply cases discussing the standard of review for a motion notwithstanding the verdict interchangeably with cases discussing motions for judgment as a matter of law. McKnight v. Johnson Controls, Inc., 36 F.3d 1396, 1400, n. 1 (8th Cir.1994)
 
 
 [4]
 42 U.S.C. Sec. 1983:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [5]
 42 U.S.C. Sec. 1985(3) (1988):
 If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.
 
 
 [6]
 REPORTING OF SUSPECTED ABUSE/NEGLECT OF STUDENTS (5015)
 The District recognizes its responsibility in helping prevent abuse. The District and its employees will follow applicable state laws in the reporting of suspected cases of abuse or neglect.
 The superintendent is responsible for formulating a procedure to be followed by District employees to be followed in suspected cases of child abuse or neglect.