Ruling on Defendant P-J’s Auto Service, Inc.’s Motion for Summary Judgment [Doc. #58-1] and Attorney’s Fees [Doc. # 58-2] and Plaintiffs’ Motion to Strike [Doc. # 55]
 

 ARTERTON, District Judge.
 

 Defendant P-J’s Auto Service, Inc. (“PJ’s”) moves pursuant to Fed.R.Civ.P. 56 for summary judgment on plaintiffs’ civil rights claims under 42 U.S.C. § 1983 on the grounds that its towing of plaintiff Lorraine Longmoor’s automobile on February 17, 2000 in the presence of Connecticut State Police officers did not constitute state action, and on plaintiffs’ state law claim of intentional infliction of emotional distress for failure of a triable factual issue on the tort’s essential elements. Further, P-J’s asserts that the frivolous nature of plaintiffs’ civil rights claims entitles it to attorneys’ fees pursuant to 42 U.S.C. § 1988(b). The Court agrees that there is no triable issue of fact with respect to plaintiffs’ claims, that they became objectively unreasonable prior to the filing of PJ’s summary judgment motion, and therefore P-J’s motion for summary judgment [Doc. # 58-1] and motion for attorney fees [Doc. # 58-2] are GRANTED. Further submissions will be required to determine the amount of attorney fees that should be awarded. As set forth below, plaintiffs’ motion to strike [Doc. # 55] is DENIED.
 

 I. Factual Background
 
 [1]
 

 P-J’s is a Connecticut Corporation owned by John J. Spaziani with its principal place of business on Main Street in Pine Meadow, Connecticut. Bill Langer is a private citizen and property owner at Woodland Acres in Barkhamsted, Connecticut, who was planning to have a modular home delivered to his property on the morning of May 17, 2000. To do so, Lan-ger had to have a tractor trailer pull it over Woodland Acres Road, a private road on plaintiff Longmoor’s property which is marked with a “no trespassing” sign. Several days before, Langer informed Resident Connecticut State Trooper John R. Bement of his plans and Trooper Bement told him to call if any problems arose during delivery (presumably anticipating some of the conflict described infra).
 

 
 *CCCXCVII
 
 On the morning of May 17, 2000, Longmoor parked her automobile on Woodland Acres Road specifically for the purpose of preventing delivery of the modular home to Langer’s lot across her property. Longmoor’s car only partially obstructed access, leaving enough room for an automobile to drive in and out but not enough room for the tractor trailer with the modular home.
 

 While the exact chronology of what occurred next is not clearly delineated in the summary judgment record, it appears that Longmoor remained in her automobile, two state police officers, including Trooper Bement, were called to the scene, and Langer began to make plans to have Longmoor’s vehicle towed from blocking the tractor trailer’s access. At this point, apparently plaintiff Keene and an unidentified individual arrived on the scene and heard the State Police officers inform Longmoor that her automobile was going to be towed.
 
 See
 
 Keene Depo. (06/03/2003) at 5L19-23.
 
 [2]
 
 Keene incorrectly deduced from the officers’ statement that the State Police had called for the tow.
 

 It is undisputed that it was Langer who telephoned Spaziani, requesting that P-J’s tow the vehicle that was blocking Woodland Acres Road and preventing him from obtaining access to his property. Spaziani, responding to Langer’s request, proceeded in his tow truck to Woodland Acres where he was met by Langer and Langer’s father, Dick Langer. He observed Longm-oor’s car parked in the road blocking access to Langer’s land, and two Connecticut State Police officers, including Trooper Bement. Spaziani inquired of Trooper Bement as to whether he would be arrested if he towed Longmoor’s automobile. Trooper Bement “told [Spaziani] that [he] could not order [Spaziani] to tow the car and that the towing of the car was between [Spaziani] and Mr. Langer, who called PJ’s to tow the car. [Trooper Bement] informed [Spaziani] that [he] was there for public safety and to keep the peace.” Bement Aff. ¶ 8.
 
 [3]
 
 During this discourse, Longmoor appears to have remained in her automobile, and Spaziani says she was within earshot when Trooper Bement stated that he could not order Spaziani to tow the vehicle.
 
 See
 
 Supp. Spaziani Aff. ¶4.
 

 At some point, Longmoor got out of her car, prompted by either Trooper Bement or the other unidentified State Police officer. Next, Bill Langer directed Spaziani to tow Longmoor’s car. Spaziani did not ask for or receive assistance from the State Police officers. Spaziani asked Longmoor in the presence of Bill Langer, Dick Langer, and Officer Bement for the keys to her automobile in order to facilitate the towing. Spaziani says Longmoor freely and willingly turned the keys over to him. By affidavit, Longmoor contradicts this account: “I turned those keys over to Mr. Spaziani under threat that if I did not surrender my keys to him my car would be damaged. In my presence and his, two state troopers stated that my car was going to be towed whether I surrendered my keys or not.” Longmoor Aff. ¶ 4. Longmoor’s affidavit account, specifically her characterization of a “threat” and account of what the two State Police officers said, gives a very different spin on
 
 *CCCXCVIII
 
 her earlier vague and milder deposition version of events: “I don’t recall the exact conversation, but in essence, if I was to leave my car where it was on the road locked up that it was going to be towed and that towing a car that’s locked and in gear can possibly do damage to the vehicle. So when I was informed of that, I handed the keys. I didn’t want my vehicle damaged, but yet I did not want it towed.” Longmoor Depo. (03/26/2003) at 196:11-18; see
 
 also id.
 
 at 199:21-24;
 
 [4]
 
 Longmoor Depo. (05/30/2003) at 417:6-14;
 
 [5]
 

 id.
 
 at 417:19-22.
 
 [6]
 
 No offensive conduct occurred between Spaziani and Longmoor, and, while Woodland Acres Road was marked with a “no trespassing” sign, the record is undisputed that Longmoor did not inform Spaziani that he was trespassing on her property or that her vehicle was parked on her property.
 
 [7]
 

 Spaziani towed Longmoor’s vehicle seven hundred feet to the driveway to her house. Longmoor admits that the State Police did not order P-J’s to tow her car.
 
 See
 
 Longmoor Depo. (03/26/2003) at 193:3-4. Instead, her claim of delicti is: “Mr. Spaziani and Mr. Langer trespassed on my property and seized my car, without my consent, under the eyes of two state troopers who permitted them to do so.” Longmoor Aff. ¶ 5. Similarly, plaintiff Keene also acknowledged that the State Police officers did not call P-J’s or order it to tow Longmoor’s vehicle, but believed PJ’s was acting under the specific direction of the Connecticut State Police “[bjecause [he] believe[s] the State Police were there, that P-J’s towed that car in front of the police, and the police and P-J’s are both attributable,” Keene Depo. (06/09/2003) at 13:13-16, even though he believed that PJ’s “absolutely” would have towed Longm-oor’s car even if the State Police had not been present,
 
 see id.
 
 at 15:4-14.
 

 After the tow, Spaziani left, and the mobile home was delivered to Langer’s property on the tractor trailer. Trooper Bement sums up the interaction as: “Everything was cordial. There was no hostility between any of those present. In fact I stated how nice it was that everyone was getting along so well.” Bement Aff. ¶ 11.
 

 II. Summary Judgment Standard
 

 Summary judgment “shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Fed.R.Civ.P. 56(c). Where, as here, a party moves for summary judgment against claims on which the non-moving party bears the burden of proof at trial, the moving party still shoulders the initial responsibility to inform the district court of the basis for its motion, namely, to identify those portions of the court or discovery record together with affidavits, if any, believed to demonstrate the absence
 
 *CCCXCIX
 
 of a genuine issue of material fact on an essential element of the non-moving party’s claim.
 
 See Celotex Corp. v. Catrett,
 
 477 U.S. 317, 322-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party must then go beyond the pleadings and by her own affidavits, or by evidentiary support found in the court or discovery record, designate specific facts establishing a genuine issue of material fact on any element essential to the non-moving party’s case that was sufficiently called into question by the moving party.
 
 See id.
 
 The “District Court must resolve any factual issues of controversy in favor of the non-moving party,”
 
 Lujan v. Nat’l Wildlife Fed’n,
 
 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), mindful that “at the summary judgment stage the judge’s function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.”
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The District Court’s ultimate concern is “whether there is a need for a trial— whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.”
 
 Id.
 
 at 250, 106 S.Ct. 2505.
 
 [8]
 

 III. Discussion
 

 A. 42 U.S.C. § 1983 and Private Persons
 

 The civil rights claims of plaintiffs’ amended complaint focus on procedural due process and equal protection under the Fourteenth Amendment of the United States Constitution.
 
 See
 
 Am. Compl. [Doc. #31] ¶¶ 11-16. That Amendment “is violated only ‘by conduct that may be fairly characterized as “state action.” ’ ”
 
 Barrett v. Harwood,
 
 189 F.3d 297, 301 (2d Cir.1999)
 
 (quoting Lugar v. Edmondson Oil Co.,
 
 457 U.S. 922, 924, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)). Civil liability under 42 U.S.C. § 1983 is imposed upon a party who “under color of state law” deprives a plaintiff of a right secured by the Constitution. “The statutory requirement of action ‘under color of state law’ and the ‘state action’ requirement of the Fourteenth Amendment are identical.”
 
 Barrett,
 
 189 F.3d at 301 (quotation omitted). Thus, to oppose P-J’s motion, plaintiffs must proffer evidence sufficient to permit a trier of fact to find that P-J’s acted under color of law, that is, was a state actor.
 

 “ ‘Private persons, jointly engaged with state officials in the prohibited action are acting ‘under color’ of law for purposes of [Section 1983]. To act ‘under color’ of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents.’ ”
 
 Ginsberg v. Healey Car & Truck Leasing, Inc.,
 
 189 F.3d 268 (2d Cir.1999)
 
 (quoting U.S. v. Price,
 
 383 U.S. 787, 794, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966)).
 
 [9]
 
 Whether a private party acts under color of law is a
 
 *CD
 
 fact-bound inquiry, but summary judgment is appropriate if there is no evidence to support a state actor conclusion.
 
 See id.
 
 at 271 n. 1. Although not cited by either party, there are two Second Circuit cases which provide fact patterns analogous to the present summary judgment record and analysis of this case,
 
 Ginsberg,
 
 189 F.3d 268 and
 
 Barrett,
 
 189 F.3d 297.
 

 B.
 
 Ginsberg,
 
 189 F.3d 268
 

 The relevant facts of
 
 Ginsberg
 
 are as follows: Ginsberg rented a truck from Healey Car
 
 &
 
 Truck Leasing, Inc. When Ginsberg returned the truck one month later to the showroom, a dispute arose over payment for the rental. After heated argument between Ginsberg and Hea-ley’s manager, Gary Listorti, Michael Healey asked Ginsberg to leave because Ginsberg’s disruptive behavior was disturbing customers. After Ginsberg left, Listorti called police to report the disturbance and to have an officer sent to Hea-ley’s showroom to quell any further disturbance in the event Ginsberg returned. Officer John Fitzgerald came to the showroom and was informed by Listorti about Ginsberg’s disruptive behavior and the rental payment dispute. Fitzgerald departed and brought Ginsberg back to the showroom, where Ginsberg and Listorti resumed their argument. Fitzgerald intervened, telling Ginsberg that he owed Healey the money for the truck rental and that he could be arrested for larceny if he did not pay. Fitzgerald also threatened to arrest Ginsberg for breach of the peace after Ginsberg persisted with loud argument. Ginsberg wrote Healey a check for $1,780.77 and left the showroom without being arrested. Ginsberg sued, claiming Healey and Fitzgerald deprived him of property without due process of law in violation of 42 U.S.C. § 1983.
 

 The Second Circuit affirmed the district court’s grant of summary judgment in favor of Healey, holding the evidence insufficient to create a genuine issue of material fact on whether Healey was a state actor: Fitzgerald’s active participation in the payment dispute did not create a triable issue because the undisputed evidence showed Listorti and Healey sought police assistance to prevent further disturbance in the showroom and not to resolve the payment dispute; Listorti’s description of the payment dispute to Fitzgerald was “background information ... [not sufficient to] make Healey a joint participant in state action.... ”
 
 Ginsberg,
 
 189 F.3d at 272;
 
 *CDI
 
 and Fitzgerald’s active role in resolving the payment dispute, including inducing Ginsberg to pay the bill and Healey’s receipt of the check, revealed only Fitzgerald acted on his own initiative and not pursuant to any agreement or plan with Healey.
 

 C.
 
 Barrett,
 
 189 F.3d 297
 

 In
 
 Barrett,
 
 plaintiffs John and Lynne Barrett purchased a truck from defendant Mary Harwood, John Barrett’s ex-wife. Harwood subsequently retained defendant Scott Smith to repossess the truck because of, according to Harwood, overdue payments. Anticipating that John Barrett would resist repossession, Smith contacted village police to request that a police officer be dispatched to the scene where Smith planned to repossess the vehicle. Sergeant Ritchie informed him that one would be sent if available and, ultimately, ordered Officer Durant to the scene, informing him that a breach of peace was anticipated. Officer Durant did not physically assist in the repossession. While Smith was beginning to connect the truck to his tow truck, John Barrett approached and asked what Smith was doing, to which question Officer Durant responded that Smith was repossessing the truck. John and Lynne Barrett objected to the repossession and provided Officer Durant with documents claimed to show proof of timely payments. After reviewing the documents, Officer Durant informed Lynne Barrett that the incident was a civil matter in which the police could not get involved and recommended they obtain a lawyer. Inflammatory words ensued between John Barrett and Harwood, who had arrived at the scene, prompting Officer Durant to tell them to quiet down; then John Barrett struck Smith and Officer Durant told Barrett that he would put him in the back of the police cruiser if Barrett started any trouble. John Barrett understood the statement to mean the officer would arrest him if he took any further measures to resist repossession. The Barretts thus handed Smith the keys to the truck, “stating in an affidavit filed later that the officer’s threat of arrest was the sole reason they gave up the keys.”
 
 Barrett,
 
 189 F.3d at 300. The Barretts sued, asserting violation of their constitutional right to due process under 42 U.S.C. § 1983.
 

 The Second Circuit affirmed the district court’s grant of summary judgment in favor of both Harwood and Smith, holding the summary judgment record insufficient to create a triable issue on whether Smith was acting under color of law when he repossessed the truck or whether Har-wood was a state actor. “We have not had occasion to address directly the point at which official involvement in an otherwise private repossession is sufficient to constitute state action. Although several courts have considered this question in analogous circumstances, no bright line has been drawn delineating the exact point at which an officer’s presence and activities at the scene of a repossession become state action in aid of the repossession.”
 
 Barrett,
 
 189 F.3d at 302. The Second Circuit found no state action under the facts because Officer Durant’s actions were directed to preventing violence and not facilitating repossession. Of significance to the Second Circuit were the facts that Durant was dispatched to keep the peace, told the Barretts that repossession was a civil matter, and was responding to violent conduct when telling Barrett he would put him in the cruiser if he started any trouble. Barrett’s subjective interpretation of Officer Durant’s statement as a threat with respect to resisting repossession was not material because “Officer Durant was acting well within his role as a law enforcement officer [in responding to an act of aggression].”
 
 Barrett,
 
 189 F.3d at 303. Thus, the officer’s role as peace keeper
 
 *CDII
 
 “did not convert the private act of repossession by Smith, the tower, into state repossession action.”
 
 Id.
 
 at 303. Although Officer Durant’s informing John Barrett that his truck was being repossessed did not make Smith, the tower, a joint participant in state action, the Second Circuit suggested that “an officer
 
 might
 
 ... be hable if the evidence showed ... that the officer came on the scene at the request of the repossessor and said to the debtor, ‘don’t interfere with this repossession,’ or ‘you know you’re not the rightful owner of this truck.’ ”
 
 Id.
 
 at 303 (emphasis added); see
 
 also id.
 
 at 305 (Parker, J., concurring).
 

 D. The Present Case
 

 It is obvious, in light of
 
 Ginsberg
 
 and
 
 Barrett,
 
 that there is no genuine dispute on whether P-J’s was a state actor — it was not. It is undisputed that P-J’s was not called by the State Police to tow, that the State Police gave no order to tow, and that the State Police did nothing more than lend their presence as a peace keeping measure. Spaziani did not request or bring police presence. He was summoned by a private person, Bill Langer. Upon arriving at the towing scene, where he first observed State Police, Spaziani simply confirmed with Trooper Bement that he would not be arrested if he towed Longmoor’s automobile. Trooper Bement explicitly told Spaziani that his (Bement’s) presence at the scene was not to aid any towing purpose: he could not order the car towed; the towing of the automobile was a civil matter; the towing was between Spaziani and Langer, and the State Police were present only to keep the peace. It was Langer who directed Spaziani to commence with the tow, and the police officers did not assist. As in
 
 Ginsberg
 
 and
 
 Barrett,
 
 there is thus a total and critical absence of any evidence of a meeting of the minds between Spaziani and the State Police to accomplish a common purpose together, here, the towing of Longmoor’s automobile, and the State Police were at the towing scene as peace keepers in accord with their official duties.
 

 That Langer informed Bement several days prior to May 17, 2000, of his plans for delivery of his modular home is the type of background information
 
 Ginsberg
 
 held cannot convert P-J’s into a state actor. Trooper Bement’s affidavit reveals that his response to Langer implicated only his role as peace keeper and not civil dispute resolver. His response contains no common towing purpose with P-J’s and the intent underlying Langer’s inquiry is irrelevant.
 
 See Ginsberg,
 
 189 F.3d at 272.
 

 Longmoor’s and Keene’s deposition testimony that the State Police told Longm-oor that her automobile was going to be towed and Longmoor’s deposition testimony that they also told her that such towing could possibly cause damage to her vehicle create no triable issue as to whether P-J’s was acting under color of state law. First, like Officer Durant’s response to John Barrett that his truck was being repossessed in
 
 Barrett,
 
 the testimony reveals nothing more than an observation of the fact that Langer was going to have P-J’s Spaziani tow Longmoor’s vehicle and a corresponding observation that possible damage could result to a car towed while in gear. No inference can be drawn from the statement of the State Police that they were acting to accomplish with Spaziani the common goal of towing Longmoor’s vehicle. Second, even accepting Longm-oor’s revisionist testimony “whether [you] surrender your keys or not,” and characterizing the State Police statement as a threat to induce surrender of her keys, there is still no evidence that Spaziani sought such assistance with his towing job and any actual inducement achieved by the officers can only be ascribed to their own
 
 *CDIII
 
 initiative. Accordingly, on this record, PJ’s towing of Longmoor’s car was not state action, and P-J’s is entitled to summary judgment on plaintiffs’ civil rights causes of action.
 

 IV. P-J’s Motion for Attorney Fees under 42 U.S.C. § 1988 [Doc. #58] and Plaintiffs’ Motion to Strike [Doc. # 55]
 

 In support of P-J’s motion for attorney fees, defense counsel submits documents
 
 [10]
 
 that purport to recount the substance of communications between opposing counsel related to plaintiffs’ claims against defendant P-J’s. Plaintiffs’ counsel does not dispute the account but instead moves to strike the documents as violating admissibility restrictions found in Fed.R.Evid. 408. The motion to strike will be addressed below. The documents reveal the following interactions between opposing counsel:
 

 On January 9, 2003, Jason J. Vicente appeared on behalf of P-J’s before the Court for a pre-filing conference on P-J’s summary judgment motion.
 
 [11]
 
 Norman Pattis, an experienced practitioner before this Court, of the law firm Williams & Pattis, appeared on behalf of plaintiffs.
 
 [12]
 
 Also present were Steven Sarnoski on behalf of the State of Connecticut and Jim Tallberg on behalf of the Town of Bark-hamsted. Pattis conceded at the conference that, if P-J’s was called solely by a private individual to the towing scene, no state action would have existed and P-J’s could not be liable under 42 U.S.C. § 1983.
 
 [13]
 
 Pattis also indicated that, if PJ’s provided an affidavit swearing that a private party called P-J’s independent of any state action, P-J’s should be let out of the case.
 

 On February 7, 2003, Vicente spoke with Williams regarding what evidence Williams would require before P-J’s could be dismissed from the case. Williams offer three options: 1) a telephone record showing that the call for towing services came from a neighbor and not the state police; 2) an affidavit from the individual at P-J’s who took the call when it came in; and/or 3) an affidavit from the neighbor who called P-J’s to tow Longmoor’s car. On March 4, 2003, defense counsel (Wendy Kennedy Venoit) provided Williams with the affidavit of Spaziani and a letter from Trooper Bement generally detailing the facts (although in more limited form) set forth above. On March 5, 2003, Williams responded by letter, thanking defense counsel for the information and stating that, based on it, he “would be willing to
 
 *CDIV
 
 recommend to [his] clients a mutual exchange of releases with your client and a dismissal as to your client with prejudice.” Mem. in Supp. of S.J. [Doc. # 59] Vicente Aff. Ex. 3. On the same day, Vicente spoke with Williams, who stated that the information provided was sufficient to demonstrate that there was no state action on the part of P-J’s and that mutual releases would be exchanged. Vicente had releases drafted and sent to Williams under cover letter dated March 17, 2003.
 

 On March 28, 2003, Vicente spoke with Williams, who informed Vicente that his client had refused to sign the releases. In response, Vicente informed Williams that Longmoor had testified earlier in the week at a deposition (which was taking place as part of the discovery schedule involving the other eight defendants) that she had come to understood the State Police had not ordered her car towed. Upon hearing of her deposition testimony, Williams informed Vicente that he would review the testimony with his client and again request that she sign the release. Over a month passed and Williams did not act either to review his client’s testimony or to pursue getting the releases signed. On May 7, 2003, Vicente spoke with Williams, who informed Vicente that he still had not discussed the matter with his clients. Williams then suggested that, if Vicente were concerned about the cost of filing a summary judgment motion, Vicente should make a settlement offer of a portion of the projected cost of filing the motion.
 

 P-J’s principally contends that the decision to continue the litigation against P-J’s to the point of forcing a summary judgment motion warrants an award of attorney fees in light of the unrebutted evidence demonstrating that P-J’s was not a state actor. In a civil rights action under 42 U.S.C. § 1983, the Court has discretion to award a reasonable attorney fee to a prevailing party.
 
 See
 
 42 U.S.C. § 1983. “Under this provision, as interpreted by the Supreme Court, fees are routinely awarded to a prevailing plaintiff who obtains some significant measure of relief, but are not so readily available to a prevailing defendant.”
 
 LeBlanc-Sternberg v. Fletcher,
 
 143 F.3d 765, 769 (2d Cir.1998). “In order to avoid chilling the initiation and prosecution of meritorious civil rights actions, fees are not to be awarded to a prevailing defendant unless the plaintiffs action was ‘frivolous, unreasonable, or groundless, or ... the plaintiff continued to litigate after it clearly became so.’ ”
 
 Id.
 
 at 770
 
 (quoting Christiansburg Garment Co. v. Equal Employment Opportunity Comm’n,
 
 434 U.S. 412, 422, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978)). “[C]ourts must take care not to .‘engage in
 
 post hoc
 
 reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation.’ ”
 
 Id. (quoting Christiansburg,
 
 434 U.S. at 421-22, 98 S.Ct. 694). “[T]he determination as to whether the claims were frivolous, unreasonable, or groundless requires an evaluation of the allegations and the proof in light of the controlling principles of substantive law.”
 
 Id.
 

 Under the undisputed facts
 
 of
 
 the present summary judgment record, and as demonstrated by the discussion above, the Court concludes that plaintiffs civil rights claim against P-J’s became clearly unreasonable prior to P-J’s filing its summary judgment motion. While exactly when an officer’s presence and assistance at the scene of a towing reaches the point at which private towing takes on the character of state action is a highly factual inquiry,
 
 see Barrett,
 
 189 F.3d at 302, the controlling Second Circuit precedent discussed above,
 
 Barrett
 
 and
 
 Ginsberg,
 
 leaves no doubt that there was no mérito-
 
 *CDV
 
 nous cause of action against P-J’s. While Williams appears not to have been aware of the cited precedent, he clearly understood that the joint participation could not apply to P-J’s involvement with Longm-oor. Accordingly, the Court believes an award of fees in this case is justified. How much that award should be, however, is another matter. From this record, plaintiffs’ claims against P-J’s became clearly unreasonable by at least May 7, 2003, the date of Williams’ attempted hold up, after which defense counsel began in earnest to prepare P-J’s summary judgment motion. From the attorney fee submission, P-J’s fees incurred after that date for the summary judgment motion and motion for attorneys’ fees total $6,765. However, the present record contains no information regarding plaintiffs’ ability to pay, a necessary consideration in awarding fees to a prevailing defendant.
 
 See e.g., Toliver v. County of Sullivan,
 
 957 F.2d 47, 49-50 (2d Cir.1992);
 
 Farad v. Hickey-Freeman Co.,
 
 607 F.2d 1025, 1028-29 (2d Cir.1979). Accordingly, P-J’s motion for attorney’s fees [Doe. # 58] is GRANTED, and, if plaintiffs claim inability to pay the described attorney fee, they are directed to submit to the Court by May 1, 2004 a sworn declaration in support of such position.
 

 Assessing some amount of fees against plaintiffs, however, does not alleviate the Court’s grave concerns regarding Williams’ conduct. Williams having recognized the objectively baseless nature of his clients’ § 1983 state action claim against P-J’s, Williams knowingly put P-J’s to the expense of filing a summary judgment motion to which he knew there was no good faith basis for opposition. Accordingly, Williams is ordered to show cause why the Court should not impose sanctions pursuant to 28 U.S.C. § 1927 and/or Fed. R.Civ.P. 11(c)(1)(B)
 
 [14]
 
 for a violation of Fed.R.Civ.P. 11(b)(2) with respect to his opposition to P-J’s motion.
 
 [15]
 
 For discussions of the distinction between these two separate bases on which a district court may sanction an attorney, see
 
 Salovaara v. Eckert,
 
 222 F.3d 19, 32-35 (2d Cir.2000);
 
 Ted Lapidus, S.A. v. Vann,
 
 112 F.3d 91, 96-97 (2d Cir.1997).
 

 In support of their motion to strike, plaintiffs argue that, under D. Conn. L. Civ. R. 56(a)3., motions for summary judgment must be supported by affidavit of a witness competent to testify at trial or evidence that would be admissible at trial, and that, under Fed.R.Evid. 408, the four submissions memorializing communications between opposing counsel here would not be admissible. The easy answer to plaintiffs’ motion is that defense counsel did not submit the affidavit, facsimile, and two letters, in support of the motion for summary judgment as proof of what would be offered at trial in support of P-J’s defense; rather, the submissions were made explicitly for the purpose of seeking an award of attorney fees under 42 U.S.C. § 1988.
 
 See EMI Catalogue Partnership v. CBS/Fox Co.,
 
 No. 86Civ.1149, 1996 WL 280813, at *2
 
 *CDVI
 
 (S.D.N.Y. May 24, 1996)(holding court may rely on evidence of settlement negotiations in evaluating whether action was objectively unreasonable for purposes of award of attorney fees under § 505 of the Copyright Act). Thus, plaintiffs provide the Court with no basis on which to grant their motion; their motion [Doc. # 55] is DENIED.
 

 Y. Intentional Infliction of Emotional Distress
 

 P-J’s asserts that the summary judgment record does not support plaintiffs’ state law claim for intentional infliction of emotional distress against it,
 
 see Longmoor v. Nilsen,
 
 285 F.Supp.2d 132, 142-43 (D.Conn.2003), because the undisputed record facts cannot support a finding of the essential elements of that tort, including extreme and outrageous conduct, severe emotional distress, and knowledge that plaintiffs’ emotional distress was likely to result from P-J’s conduct,
 
 see Appleton v. Bd. of Educ. of Town of Stonington,
 
 254 Conn. 205, 210, 757 A.2d 1059 (2000). Plaintiffs neither address this challenge in opposition nor make any mention of the state law claim.
 
 [16]
 

 P-J’s has satisfied its responsibility to inform the Court of the basis for its motion by pointing to the absence of evidence on an essential element of plaintiffs’ intentional distress claim.
 
 See Celotex,
 
 477 U.S. at 322-24, 106 S.Ct. 2548. While plaintiffs in response offer the affidavit of Longmoor, they point the Court to no favorable case law demonstrating that the facts sworn therein are material to the challenged elements of the common law claim for intentional infliction of emotional distress or otherwise provide the Court with an analysis of how such facts establish an issue of material fact when on its face the facts asserted in the affidavit do not show extreme or outrageous conduct.
 
 See id.; see also Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(A fact is “material” for these purposes if it “might affect the outcome of the suit under the governing law.”). Accordingly, P-J’s is entitled to summary judgment on plaintiffs’ state law claim.
 
 [17]
 

 VI. Conclusion
 

 As set forth above, P-J’s motion for summary judgment on plaintiffs’ claims [Doc. # 58-1] is GRANTED; P-J’s motion for attorney’s fees [Doc. # 58-1] is GRANTED; and plaintiffs’ motion to strike [Doc. # 55] is DENIED. The Clerk is directed to enter judgment in favor of P-J’s. Attorney Williams is directed to show cause by May 1, 2004, why the Court should not sanction him pursuant to Fed. R.Civ.P. 11(c)(1)(B) for conduct in connection with and his filing of opposition to PJ’s motion, and pursuant to 28 U.S.C. § 1927 for the same conduct. If plaintiffs claim inability to pay the described attorney fee, they are directed to submit to the Court by May 1, 2004 a sworn declaration in support of such position.
 

 IT IS SO ORDERED.
 

 [1]
 

 . Unless otherwise stated, the facts are undisputed or as set forth by plaintiffs. The Court notes that the sole submission of plaintiffs for the summary judgment record was an affidavit of Longmoor and that the Court has drawn from Longmoor’s factual account therein rather than her counsel’s strained and inaccurate rendition of it.
 

 [2]
 

 . "[W]hen we went up to the chain or gate, whatever you want to call it, there were State Police there, and they informed Lorraine that her car was going to be towed.”
 

 [3]
 

 . This statement is consistent with Spaziani's account,
 
 see
 
 Spaziani Aff. ¶ 4 ("[Trooper Bement] viewed it to be a matter for the civil courts and not a police matter”), and Bement’s own statement of purpose,
 
 see
 
 Bement Aff. ¶ 5 ("My sole purpose was to assure public safety and maintain the peace.”).
 

 [4]
 

 . "I don’t recall the conversation on what Trooper Bement told me on that day.”
 

 [5]
 

 . “Not that I can recall specifically. My conversation, what I said, I do know that one of the officers, State Police troopers, that was there told me that if I left my car locked and in gear on this hillside— I am on a hill— and that they were going to tow my car that physical damage could be— could happen to my car because it was towed in a locked condition in gear.”
 

 [6]
 

 . “But I was told, like I said, that physical damage to the car could happen if it was towed when it was in gear, and that’s why I handed the keys to the person with the tow truck.”
 

 [7]
 

 . Also prior to the towing, Keene asked Trooper Bement what would happen if the car was damaged while it was towed, and Trooper Bement responded that it would be a civil matter.
 

 [8]
 

 . Although plaintiffs do not move under Fed. R.Civ.P. 56(f) for a continuance of P-J's summary judgment motion to permit further discovery, they suggest that P-J's motion is premature as "[d]iscovery has not yet concluded in this case.” Opp’n [Doc. # 63] at 5 (unnumbered). Plaintiffs fail to mention, however, that the Court’s scheduling order of January 9, 2003, explicitly required discovery regarding claims against defendant P-J’s to be completed by March 10, 2003.
 
 See
 
 Order [Doc. # 43].
 

 [9]
 

 . The Court recognizes that, as a general matter, factors other than participation in joint activity are relevant to whether private persons may be considered state actors:
 

 
 *CD
 
 What is fairly attributable [to the State] is a matter of normative judgment, and the criteria lack rigid simplicity. From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the board for finding state action; nor is tiny set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government. ...
 

 Our cases have identified a host of facts that can bear on the fairness of such an attribution. We have, for example, held that a challenged activity may be state action when it results from the State’s coercive power, ..., when the State provides significant encouragement, either overt or covert, ..., or
 
 when a private actor operates as a willful participant in joint activity with the State or its agents ...
 

 Brentwood Academy v. Tennessee Secondary School Athletic Association,
 
 531 U.S. 288, 295-96, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001)(emphasis added). However, notwithstanding plaintiffs’ confusion over exactly what their civil rights claims are,
 
 compare
 
 Am. Compl. [Doc. #31] ¶¶ 11-16 (clearly alleging violations of procedural and substantive due process, equal protection, and bill of attainder clause)
 
 with
 
 Opp’n [Doc. # 63] at 13 (unnumbered)(failing to refer to any claims of amended complaint and suggesting plaintiffs actually maintain a Fourth Amendment claim for seizure of property without a warrant), they agree that the relevant factor/test in opposing P-J's motion for summary judgment is the joint activity one.
 

 [10]
 

 . An affidavit of defense counsel dated May 16, 2003, a facsimile from plaintiffs’ counsel to defense counsel dated March 5, 2003, and two letters from defense counsel to plaintiffs’ counsel dated respectively March 6 and March 17, 2003, including all attachments to the latter.
 

 [11]
 

 . Recognizing the significant consumption of the parties' and judicial resources necessarily involved in the filing and ruling on dispositive motions, this Court maintains a practice of holding pre-filing conferences for the purpose of exploring with counsel whether there is a more efficient, less expensive means of resolving the issues in dispute.
 
 See
 
 D. Conn. L. Civ. R. 16(a).
 

 [12]
 

 . Williams signed the complaint and plaintiffs’ opposition to the present motion.
 

 [13]
 

 . The Court's reporter’s informal transcript of the conference reveals that, faced with PJ's claim that a private individual acting on his own called P-J's and no one else, Pattis strongly suggested that there would be no § 1983 claim against P-J's and also suggested that, because of the state action problem and an issue surrounding the extend of deprivation Longmoor suffered as a result of her car being towed, the claims against P-J's be put on a different track. Accordingly, the Court set a special expedited discovery and briefing schedule for the claims against P-J's.
 

 [14]
 

 . "On its own initiative, the court may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney, law firm, or party to show cause why it has not violated subdivision (b) with respect thereto.”
 

 [15]
 

 . "By presenting to the court (whether by signing, filing...) A pleading, written motion, or other paper, an attorney ... is certifying that to the best of the person’s knowledge, information, and belief, formed after an inquiry reasonable under the circumstances — (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law....”
 

 [16]
 

 . Plaintiffs' argument that Longmoor suffered emotional distress was made in opposition to P-J's argument that Longmoor suffered
 
 no
 
 cognizable constitutional injury or, in the alternative, that such injury was de minimus.
 
 See
 
 Opp’n [Doc. #63] at 13-15 (unnumbered).
 

 [17]
 

 . The Court does not decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(3) because plaintiffs’ intentional infliction claim against P-J's arises from the same controversy as plaintiffs' remaining § 1983 claims against the remaining State Police defendants.
 
 See 28
 
 U.S.C. § 1367(a);
 
 see also Ciambriello v. County of Nassau, 292
 
 F.3d 307, 325 (2d Cir.2002).